## Exhibit 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 15 |
|  | ) |  |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.,[1] | ) | Case No. 25-10208 (TMH) |
|  | ) |  |
| Debtor in a Foreign Proceeding. | ) | **Re: Docket No. 2** |
|  | ) |  |

## ORDER GRANTING (I) RECOGNITION
## OF FOREIGN MAIN PROCEEDING, (II) FULL FORCE
## AND EFFECT TO CONCURSO PLAN AND CERTAIN RELATED RELIEF

Upon the form of petition [D.I. 1] and the *Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521* (the "**Recognition Motion**")[2] filed by Robert Wagstaff (the "**Petitioner**" or the "**Foreign Representative**"), duly appointed as the foreign representative in with respect to the Mexican Prepack Proceeding of the above-captioned Debtor (the "**Chapter 15 Debtor**") seeking entry of an order (a) granting the Recognition Motion and recognizing the business reorganization proceeding (the "**Mexican Prepack Proceeding**") of Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. pending in the 1st Federal District Court for Bankruptcy Matters with residence in Mexico City and jurisdiction throughout the Mexican Republic as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code; (b) recognizing the Petitioner as the "foreign representative"

---

[1] The last four identifying digits of the tax number and the jurisdiction in which the Chapter 15 Debtor pays taxes is Mexico – 6815. The Chapter 15 Debtor's corporate headquarters is located at Avenida Insurgentes Sur No. 730, 20th Floor, Colonia del Valle Norte, Alcaldía Benito Juárez, 03103, Mexico City, Mexico.

[2] Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Recognition Motion.

(as defined in section 101(24) of the Bankruptcy Code) of the Mexican Prepack Proceeding with respect to the Chapter 15 Debtor; (c) giving full force and effect and granting comity in the United States to the Concurso Plan and Concurso Order; (d) exculpating and releasing the Directed Parties (as defined below) from any liability for any action or inaction taken in furtherance of, and/or in accordance with, among others, the Proposed Order, the Concurso Plan, or the Concurso Order; (e) permanently enjoining all entities from taking any action in the United States that is in contravention of or that is inconsistent with the Concurso Plan or the Concurso Order; and (f) granting such other and further relief as the Court deems just and proper; and it appearing that this Court has jurisdiction to consider the Recognition Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States Court for the District of Delaware, dated February 29, 2012 (Sleet, C.J.) (the "**Amended Standing Order**"); and this being a core proceeding under 28 U.S.C. § 157(b)(2)(P); and venue for this proceeding being proper before this Court under 28 U.S.C. § 1410; and upon the Court's review and consideration of the (i) the form of petition [D.I. 1], (ii) the Recognition Motion [D.I. 2], along with the exhibits annexed thereto, (iii) the *Declaration of Juan Pablo Estrada Michel Pursuant to 28 U.S.C. § 1746* [D.I. 3] (the "**First Mexican Law Declaration**"), (iv) the *Objection of United States International Development Finance Corporation to Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [D.I. 30], (v) the *United States Trustee's Reservation of Rights to Petitioner's Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [D.I. 31], (vi) *Foreign Representative's Reply in Support of Verified Petition*

2

*for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to 11 U.S.C. § 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521* [D.I. 39], (vii) the *Supplemental Declaration of Juan Pablo Estrada Michel Pursuant to 28 U.S.C. § 1746* [D.I. 41] (the "**Supplemental Mexican Law Declaration**" and, together with the First Mexican Law Declaration, the "**Mexican Law Declarations**"), and (viii) the *Joinder of the Ad Hoc Group to the Debtor's Reply in Support of the Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect of Concurso Plan and Related Relief* [D.I. 42]; and appropriate and timely notice of the filing of the petition and Recognition Motion having been given; and no other or further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Recognition Motion, the Mexican Law Declarations, and all other pleadings and papers in this case establish just cause to grant the relief ordered herein; and after notice and a hearing and due deliberation thereon;

### THIS COURT HEREBY FINDS AND DETERMINES THAT:

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction to consider this matter pursuant to sections 157 and 1334 of title 28 of the United States Code, and the Amended Standing Order.  This is a core proceeding

3

pursuant to section 157(b)(2)(P) of title 28 of the United States Code. Venue for this proceeding

is proper before this Court pursuant to section 1410 of title 28 of the United States Code.

C.      The Petitioner is the duly appointed "foreign representative," within the meaning

of section 101(24) of the Bankruptcy Code, of the Mexican Prepack Proceeding with respect to

the Chapter 15 Debtor.

D.      This Chapter 15 Case was properly commenced pursuant to sections 1504, 1509,

and 1515 of the Bankruptcy Code.

E.      The Petitioner has satisfied the requirements of section 1515 of the Bankruptcy

Code, Bankruptcy Rules 1007(a)(4), 2002(q) and 7007.1, and Rules 2002-1(h) and 9013-1(m) of

the Local Bankruptcy Rules for the District of Delaware (the "**Local Rules**").

F.      Due and proper notice of the filing of, and the hearing on, the Recognition Motion

has been provided in accordance with the Order Pursuant to Federal Rules of Bankruptcy

Procedure 2002(m) and (q) and 9007 Scheduling Hearing and Specifying Form and Manner of

Service of Notice [D.I. 23] (the "**Scheduling Order**") and in compliance with the requirements of

Bankruptcy Rule 2002(q), which notice is deemed adequate for all purposes, and no other or

further notice need be provided.

G.      The Mexican Prepack Proceeding is a "foreign proceeding" pursuant to section

101(23) of the Bankruptcy Code.

H.      The Mexican Prepack Proceeding is entitled to recognition by this Court pursuant

to section 1517 of the Bankruptcy Code.

I.      Mexico is the center of main interests of the Chapter 15 Debtor. Accordingly, the

Mexican Prepack Proceeding is the "foreign main proceeding" of the Chapter 15 Debtor, as that

4

term is defined in section 1502(4) of the Bankruptcy Code, and is entitled to recognition as such pursuant to section 1517(b)(1) of the Bankruptcy Code.

J.       The Petitioner and the Chapter 15 Debtor, as applicable, are entitled to the relief available pursuant to section 1520 of the Bankruptcy Code and to additional assistance and discretionary relief requested in the Petition pursuant to sections 1507 and 1521(a) of the Bankruptcy Code.

K.       Absent permanent injunctive relief, the Mexican Prepack Proceeding and the Chapter 15 Debtor's efforts to consummate the Concurso Plan could be thwarted by the actions of certain creditors, a result that would be inconsistent with the purposes of chapter 15 of the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.  Such actions could threaten, frustrate, delay, and ultimately jeopardize the Mexican Prepack Proceeding and implementation of the Concurso Plan, and, as a result, the Chapter 15 Debtor, its creditors and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

L.       Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the Mexican Prepack Proceeding and Concurso Plan, (iii) is an integral element of the Mexican Prepack Proceeding and Concurso Plan, and/or to their respective effectuation, (iv) confers material benefits on, and is in the best interests of the Chapter 15 Debtor and its creditors, including, without limitation, the holders of NY Notes, and (v) is important to the overall objectives of the Chapter 15 Debtor's consensual restructuring.

M.       The relief granted herein will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may result to such parties, it

5

is outweighed by the benefits of the requested relief to the Chapter 15 Debtor, its estate, and all of its creditors.

N.      The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of chapter 15 and to protect the Chapter 15 Debtor, its creditors and other parties in interest.

O.      The relief requested herein is necessary and appropriate, in the interests of the public and international comity; it is consistent with the public policy of the United States; it is warranted pursuant to sections 105(a), 1507(a), 1509(b), 1515, 1517, 1520, 1521(a) of the Bankruptcy Code.

P.      For all of the foregoing reasons, and for the reasons stated by the Court at the hearing on the Recognition Motion and reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor, it is hereby:

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Recognition Motion is granted.

2.      The Petitioner is the duly appointed foreign representative of the Mexican Prepack Proceeding with respect to the Chapter 15 Debtor, within the meaning of section 101(24) of the Bankruptcy Code, and is authorized to act on behalf of the Chapter 15 Debtor in this Chapter 15 Case.

3.      The Petitioner may operate the Chapter 15 Debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552 of the Bankruptcy Code, including, without limitation, the authority to direct the Indenture Trustee.

4.      The Mexican Prepack Proceeding is granted recognition as the foreign main proceeding of the Chapter 15 Debtor pursuant to section 1517 of the Bankruptcy Code.

6

5.      The Concurso Plan and the Concurso Order, including any amendments or modifications thereto, and subject to all limitations and conditions precedent set forth therein, are hereby recognized, granted comity, and given full force and effect to the same extent that they are given effect in Mexico and each is binding on all creditors of the Chapter 15 Debtor, including holders of the NY Notes, the Directed Parties (as defined below), and any of their respective successors or assigns and all persons having notice of the Recognition Motion.[3]

6.      All the relief and protection afforded to a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code is hereby granted to the Mexican Prepack Proceeding, the Chapter 15 Debtor, and all parties in interest, as applicable.

7.      The Petitioner, the Chapter 15 Debtor, and each of their respective successors, agents, representatives, advisors, and counsel shall be entitled to the protections contained in sections 306 and 1510 of the Bankruptcy Code.

8.      The Directed Parties, their respective agents, attorneys, successors, and assigns are hereby authorized and directed to take actions necessary to implement the restructuring transactions approved by the Concurso Order and shall fully cooperate and facilitate the cancellation of the NY Notes, as applicable, pursuant to the Concurso Plan.  Specifically, the Foreign Representative is hereby authorized and directed to provide documentation to the DTC for the cancellation of the NY Notes. Further, the Directed Parties, their respective agents, attorneys, successors, and assigns are hereby authorized and directed to take any other lawful

---

[3]      Collectively, the "Directed Parties" are: (i) The Bank of New York Mellon, as the indenture trustee of the NY Notes (the "**Indenture Trustee**"); (ii) the Depository Trust Company ("**DTC**"), Euroclear Bank S.A./N.V., and/or Clearstream Banking, Société Anonyme, as clearing systems, as applicable, (iii) Kroll Agency Services Limited, (iv) the custodians of the NY Notes, and (v) the administrative agents under the outstanding loan facilities of the Chapter 15 Debtor.

actions as provided in the Concurso Plan or Concurso Order or as otherwise instructed by the Foreign Representative that are reasonable and necessary to cancel the NY Notes.

9.      The Directed Parties and their respective officers, directors, employees, representatives, advisors, attorneys, professionals, and managers, in each case, solely in their respective capacities as a Directed Party, shall be entitled to a full limitation of liability from and shall have no liability for any and all claims, obligations, suits, judgments, damages, rights, causes of action, liabilities from, or in connection with, any action or inaction taken in furtherance of and/or in accordance with this Order, this Chapter 15 Case, the Prior Chapter 15 Case, the Mexican Liquidation Proceeding, the Involuntary Chapter 11 Case, the Mexican Prepack Proceeding, the Concurso Plan, and/or the Concurso Order, except for any liability arising from any action or inaction constituting gross negligence, fraud or willful misconduct as determined by this Court.

10.     As a condition precedent to the cancellation of the NY Notes and pursuant to the terms of the respective indentures of the NY Notes, the Chapter 15 Debtor shall pay or reimburse the reasonable and documented fees, costs and expenses of the Indenture Trustee (including its attorneys' fees, costs and expenses) incurred in connection with the Mexican Prepack Proceeding, this Chapter 15 Case, the Prior Chapter 15 Case, the Mexican Liquidation Proceeding, the Involuntary Chapter 11 Case, and the implementation of the transactions provided for in the Concurso Plan and/or Concurso Order.

11.     Subject to sections 1520 and 1521 of the Bankruptcy Code, upon entry of this Order, the Mexican Prepack Proceeding, the Concurso Plan, and the Concurso Order shall be and hereby are granted comity and given full force and effect in the jurisdiction of the United States, and any property of the Chapter 15 Debtor within the territorial jurisdiction of the United States is

8

protected from actions inconsistent with or interfering with the enforcement and implementation of the Mexican Prepack Proceeding, the Concurso Plan, and Concurso Order, including:

<ol type="a" start="1">
<li>executing against any of the Chapter 15 Debtor's assets;</li>

<li>commencing or continuing a judicial, administrative, arbitral, or other action or proceeding, or attempt to recover a claim, which in either case in any way relates to, or would interfere with or impede, the administration of the Chapter 15 Debtor's estate in the Mexican Prepack Proceeding, or the solicitation, implementation, or consummations of the Concurso Plan, the Concurso Order, or the terms of this Order, including without limitation any and all unpaid judgments, settlements, notes, or otherwise against the Chapter 15 Debtor, the Petitioner, the Indenture Trustee, or the DTC, in the United States and any of their successors or assigns;</li>

<li>taking or continuing any act to create, perfect, or enforce a lien or other security interest, set-off, or other claims against the Chapter 15 Debtor or any of its property;</li>

<li>transferring, relinquishing, or disposing of any property of the Chapter 15 Debtor to an entity (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Petitioner; or</li>

<li>commencing or continuing an individual action or proceeding concerning the Chapter 15 Debtor's assets, rights, obligations, or liabilities to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code;</li>
</ol>

12.    Notwithstanding anything to the contrary contained herein, this Order shall not be construed as enjoining (a) the police or regulatory act of a governmental unit, including a criminal action or proceeding, to the extent not stayed pursuant to section 362 of the Bankruptcy Code or staying the exercise of any rights not stayed pursuant to section 362(o) of the Bankruptcy Code, (b) any action permitted or contemplated by or taken with respect to the implementation of (i) the Concurso Plan (ii) the Concurso Order, or (iii) any agreement entered into in connection with the Concurso Plan, or (c) solely to the extent that the Concurso Plan is no longer effective under Mexican law for any reason, any action that is not prohibited by the Mexican Court with jurisdiction over the Concurso Plan or Mexican law.

9

13.     Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Petitioner is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

14.     Nothing in this Order shall prohibit or enjoin any party in interest from participating in the Mexican Prepack Proceeding, including any appeals thereto.

15.     Nothing in this Order shall limit any right of any Indenture Trustee to collect its respective fees and expenses from the holders of the NY Notes, or its liens on any payment made of consideration given with respect to such securities, as applicable, and in each case as and to the extent set forth in the documents governing the NY Notes.

16.     Certain rights of the Indenture Trustee under the respective indentures of the NY Notes shall be preserved as set forth herein.

17.     Nothing in this Order shall limit or impair the present or future rights of holders (or their agents) of debt or equity issued in accordance with the Concurso Plan, which instruments and obligations, once issued and in effect, shall be enforceable obligations of the Chapter 15 Debtor that are not subject to any modification or override except in accordance with their express terms.

18.     A copy of this Order, confirmed to be true and correct, shall be served by the Petitioner, within seven business days of entry of this Order, in accordance with this Court's Scheduling Order. Such service shall be good and sufficient service and adequate notice for all purposes.

10

19.     This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation, implementation, enforcement, amendment, or modification of this Order and any requests for additional relief or any adversary proceeding brought in and through this case.

*Thomas M. Horan*

**Dated: March 11th, 2025**
**Wilmington, Delaware**

**THOMAS M. HORAN**
**UNITED STATES BANKRUPTCY JUDGE**

11

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | . Chapter 15 |
| | . |
| | . Case No. 22-10630(TMH) |
| CREDITO REAL, S.A.B. de | . |
| C.V., SOFOM, E.N.R., | . 824 Market Street |
| | . Wilmington, Delaware 19801 |
| Debtor in a Foreign Proceeding. | . |
| . . . . . . . . . . . . . . . . | . Tuesday, March 11, 2025 |
| | . |
| IN RE: | . Chapter 11 |
| | . |
| CREDITO REAL, S.A.B. de | . Involuntary |
| C.V., SOFOM, E.N.R., | . Case No. 22-10696(TMH) |
| | . |
| Putative Debtor. | . |
| . . . . . . . . . . . . . . . . | . |
| IN RE: | . Chapter 15 |
| | . |
| CREDITO REAL, S.A.B. de | . Case No. 25-10208(TMH) |
| C.V., SOFOM, E.N.R., | . |
| | . |
| Debtor in a Foreign Proceeding. | . |
| . . . . . . . . . . . . . . . . | . |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE THOMAS M. HORAN
UNITED STATES BANKRUPTCY JUDGE

Audio Operator:          Electronically Recorded
                         by Ian Willoughby, ECRO

Transcription Company:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         (302)654-8080
                         Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:

For Robert Wagstaff,
as Petitioner and Foreign
Representative:                     Amanda R. Steele, Esq.
                                    Emily R. Mathews, Esq.
                                    RICHARDS, LAYTON & FINGER, PA
                                    One Rodney Square
                                    920 North King Street
                                    Wilmington, Delaware 19801

                                    John K. Cunningham, Esq.
                                    WHITE & CASE, LLP
                                    200 South Biscayne Boulevard
                                    Suite 4900
                                    Miami, Florida 33131

                                    Lilian Marques, Esq.
                                    Claire M. Campbell, Esq.
                                    WHITE & CASE, LLP
                                    1221 Avenue of the Americas

                                    New York, New York 10020

                                    Jason Zakia, Esq.
                                    WHITE & CASE, LLP
                                    111 South Wacker Drive
                                    Suite 5100
                                    Chicago, Illinois 60606
                                    Sarah Silveira, Esq.
                                    RICHARDS, LAYTON & FINGER, PA


For the U.S. Trustee:               Timothy J. Fox, Esq.
                                    OFFICE OF THE U.S. TRUSTEE
                                    844 King Street, Suite 2207
                                    Wilmington, Delaware 19801

For the Ad Hoc Group and
Petitioning Creditors:              L. Katherine Good, Esq.
                                    POTTER, ANDERSON & CORROON, LLP
                                    1313 North Market Street
                                    6th Floor
                                    Wilmington, Delaware 19801

(Appearances Continued)

APPEARANCES:  (Continued)

For the Ad Hoc Group and
Petitioning Creditors:              David H. Botter, Esq.
                                    Carina S. Wallance, Esq.
                                    Miranda Hatch, Esq.
                                    Lucas Davidenco, Esq.
                                    CLEARY, GOTTLIEB, STEEN
                                     & HAMILTON, LLP
                                    One Liberty Plaza
                                    New York, New York 10006


For the United States
International Development
Finance Company:                    John C. Gentile, Esq.
                                    BENESCH, FRIEDLANDER, COPLAN
                                     & ARONOFF, LLP
                                    1313 North Market Street
                                    Suite 1201
                                    Wilmington, Delaware 19801

                                    Benjamin Butterfield, Esq.
                                    Darren Smolarski, Esq.
                                    MORRISON & FOERSTER, LLP
                                    250 West 55th Street
                                    New York, New York 10019

For The Bank of New
York Mellon:                        Cameron A. Capp, Esq.
                                    REED SMITH, LLP
                                    1201 Market Street, Suite 1500
                                    Wilmington, Delaware 19801

                                    Francisco Vazquez, Esq.
                                    NORTON ROSE FULBRIGHT, LLP
                                    1301 Avenue of the Americas
                                    New York, New York 10019


APPEARANCES VIA ZOOM:  (On the Record)

Also Appearing:                     Juan Pablo Estrada Michel, Esq.
                                    LOPEZ MELIH Y ESTRADA, S.C.

4

<u>INDEX</u>

<u>PAGE</u>

<u>CASE NO. 25-10208 (TMH)</u>

Verified Petition for Recognition of Foreign Main            5
Proceeding and Motion for Order ranting Full Force and
Effect to the Concurso Plan and Related Relief

    <u>Court Decision</u>                                        61


<u>CASE NO. 22-10630 (TMH)</u>
Motion for Entry of an Order (I) Approving the               63
Withdrawal of the Verified Petition for Recognition
of the Mexican Liquidation Proceeding, (II) Dismissing
the Chapter 15 Case, and (III) Granting Related Relief
-and-
<u>CASE NO. 22-10696 (TMH)</u>
Joint Motion of the Putative Debtor and the Ad Hoc Group
Dismissing the Involuntary Chapter 11 Petition Filed by
the Ad Hoc Group


<u>EXHIBIT</u>                                                 <u>EVID.</u>

FR Exhibit 1   Wagstaff Declaration at ECF No. 2            13
FR Exhibit 2   Estrada Michel Declaration at ECF No. 3     14
FR Exhibit 11  Estrada Michel Declaration at ECF No. 41    14
FR Exhibits 3 through 10                                    14
FR Exhibits 12 through 14                                   15

DFC Exhibit 1                                               16

1          (Proceedings commence at 2:59 p.m.)

2          (Call to order of the Court)

3                THE COURT:  Good afternoon.  Please be seated.

4                Hello, Ms. Steele.  Welcome.

5                MS. STEELE:  Good afternoon, Your Honor.  For the

6      record, Amanda Steele, Richards, Layton & Finger, on behalf

7      of the foreign representative.

8                Your Honor, we have three matters on the calendar

9      today from three different case numbers.  But we would

10     propose to proceed with the recognition motion most recently

11     filed in the most recent Chapter 15 case.  And I will turn it

12     over to my co-counsel John Cunningham from White & Case.

13                THE COURT:  Very good.

14                MS. STEELE:  Thank you, Your Honor.

15                THE COURT:  Thank you.

16                Mr. Cunningham, welcome.  It's good to see you.

17                MR. CUNNINGHAM:  Good to see you, Your Honor.  Good

18     afternoon.

19                So, for the record, John Cunningham of White & Case

20     on behalf of the foreign representative in this Chapter 15

21     case, Robert Wagstaff, who is here today.  And this is in

22     connection with the voluntary Mexican reorganization

23     proceeding for Credito Real, S.A.B. de C.V., one of Mexico's

24     largest non-bank financial lenders and our Chapter 15 debtor.

25                Your Honor, I know it's been a long time, in fact,

1    the only time since we have been before Your Honor with

2    respect to Credito Real.

3              THE COURT:  Yeah.

4              MR. CUNNINGHAM:  As you might recall, on May 22nd,

5    2023, on a Zoom status conference before Your Honor, shortly

6    after the Credito Real cases were reassigned to Your Honor

7    from Judge Dorsey, at that status conference, I informed the

8    Court of the history and background of Credito Real, which I

9    just want to touch upon briefly again --

10             THE COURT:  Sure.

11             MR. CUNNINGHAM:  -- and summarize.

12             Your Honor, for almost 30 years, Credito Real had

13   provided financial services to under-served lower- and

14   middle-income individuals, predominantly in Mexico, through

15   payroll deduction loans and auto loan services, as well as

16   loans to small and medium-sized enterprises, including

17   factoring and equipment leasing.

18             To fund its operations, Credito Real raised over

19   two and a half billion U.S. dollars of funded debt, the

20   largest of which was almost $2 billion U.S. dollars of

21   unsecured note claims, a constituency of which is represented

22   by the ad hoc noteholder group and its counsel, Mr. Botter of

23   Cleary Gottlieb, who's here today.

24             Three years ago, Your Honor, February of 2022,

25   Credito Real suffered a severe liquidity crisis and failed to

1    make a one-hundred-million-dollar, U.S. dollar, payment under

2    its Swiss unsecured notes.  That payment triggered a cascade

3    of cross-defaults under various other indebtedness Credito

4    Real, including the unsecured notes governed under New York

5    law.

6              As a result, Credito Real and the ad hoc group

7    engaged in restructuring negotiations at that time, but those

8    negotiations did not initially lead to a successful deal.

9              Instead, in June of 2022, certain members of the ad

10   hoc group filed an involuntary Chapter 11 petition against

11   Credito Real in the United States Bankruptcy Court for the

12   Southern District of New York, Judge Jones.

13             Around that time, a liquidation proceeding, under

14   the Mexican Corporations Act, was filed in Mexico against

15   Credito Real by a former director and shareholder of the

16   company.

17             In July of 2022, in support of that pending Mexican

18   liquidation, we filed a Chapter 11 -- 15 case before the

19   Court, at the time Judge Dorsey, seeking recognition of the

20   Mexican liquidation proceeding and dismissal of the

21   noteholder-filed involuntary Chapter 11 case, which had been

22   transferred, by consent of the parties, from the Southern

23   District of New York to this Court, and it remains at this

24   Court.

25             Scheduled hearings, Your Honor, on the various

1   motions and requests for relief in both the Chapter 15 and

2   involuntary Chapter 11 cases were continued several times by

3   Judge Dorsey at the request of the parties, as negotiations

4   continued.  Fortunately, those negotiations were successful.

5          And in May 2023, Credito Real and the ad hoc group

6   entered into a restructuring support agreement for the global

7   restructuring of Credito Real and resolution of the pending

8   Chapter 15 and involuntary Chapter 11 cases.  In the lead-up

9   to the May 22nd, 2023 status conference before Your Honor, we

10  filed a status report with this Court, attaching that

11  restructuring support agreement.

12         At the May 2023 status conference, I described to

13  Your Honor that Credito Real and the ad hoc group would

14  commence a prepackaged Concurso plan with the Mexican

15  Concurso Court in Mexican City, which was akin to a

16  prepackaged Chapter 11 plan in Mexico.  The linchpin to such

17  plan was the creation of a Mexican trust into which

18  substantially all of the assets of Credito Real would be

19  transferred and administered by a trustee and technical

20  committee of noteholder and company representatives, for the

21  benefit of Credito Real's creditors.

22         I also stated to Your Honor at that status

23  conference that we had hoped and expected what would be the

24  next steps, and I'm quoting from the transcript of that

25  status conference.  I said to Your Honor:

1        "Upon approval of the Concurso plan by the Mexican

2    Concurso Court, and that is a federal court in Mexico, just

3    like the U.S. Bankruptcy Court here, the petitioning

4    creditors and members of the ad hoc group have agreed they

5    would withdraw their request for an involuntary Chapter 11.

6    Then we will, as part of the Chapter 15 case, we will ask

7    Your Honor to approve and give full force and effect to the

8    Concurso plan, the approved confirmed Mexico Concurso plan,

9    here in the United States, all of which is down the road to

10   happen.  As we put in our status report, Your Honor, we do

11   anticipate that the Concurso proceeding could take five to

12   eight months because it's starting a newer process, it does

13   take a little longer in Mexico because there's other events

14   that have to occur, including, you know, submitting the

15   claims and getting the recognized and like claims.  But we

16   anticipate everything will proceed and hope they will proceed

17   successfully."

18        I, obviously, underestimated, Your Honor, the

19   timing and length of the Concurso proceedings, which was

20   longer than expected.  But the end result was what we had

21   hoped:  The pre-petition Concurso plan was, ultimately,

22   accepted by the vote of the requisite majority of recognized

23   creditors and approved by the Mexican Concurso Court under

24   the Mexican bankruptcy law.

25        So that brings us full circle to today's hearing

1    and the new Chapter 15 petition and relief we're seeking

2    before Your Honor today.

3         In a nutshell, we filed the new verified Chapter 15

4    petition, Docket Number 2, commencing this Chapter 15 case

5    for Credito Real on February 27, 2025, and it is in front of

6    Your Honor, listed as Chapter 15 Case Number 2-10208.

7         The four principal requests for relief that we're

8    seeking before Your Honor today are:

9         First, this Court's recognition of the Mexico

10   Concurso proceeding as a foreign main proceeding under

11   Chapter 15 of the U.S. Bankruptcy Code;

12        Second, entry of an order by this Court, under

13   Chapter 15, giving full force and effect to the approved

14   Mexico Concurso plan within the territorial jurisdiction of

15   the United States;

16        Three, permission from this Court to withdraw and

17   dismiss the prior Chapter 15 case, Case Number 22-10630, in

18   connection with the Mexican liquidation proceeding;

19        And finally, dismissal by this Court of the

20   involuntary Chapter 11 case, Case Number 22-10630.

21        As Your Honor may have seen in the second amended

22   agenda letter filed last night, we had two filed objections

23   and/or reservation of rights:

24        First by the United States International

25   Development Finance Corporation, otherwise referred to as

1    "DFC," that's at Docket Number 30;

2              As well as the Office of the U.S. Trustee at Docket

3    Number 31.

4              As to the U.S. Trustee, we incorporated language

5    from the U.S. Trustee into a revised form of proposed order

6    granting recognition and full force and effect of the United

7    States to the Concurso plan, which we filed last night.  And

8    otherwise, the U.S. Trustee still reserves its rights.

9              Your Honor, I will -- I'll pause there and, unless

10   the Court has any questions for me, I can tell you the DFC

11   objection is still outstanding.  I think we resolved the U.S.

12   Trustee's objections, but they continue to reserve rights

13   today, so we'll hear from them.

14              I would propose we turn to the evidentiary matters,

15   Your Honor, including the evidence the debtors would submit

16   in support of the relief I just described.

17              THE COURT:  I agree.  Let's do that.

18              MR. CUNNINGHAM:  Thank you, Your Honor.

19              So I'll cede the podium to my colleague Mr. Zakia.

20              THE COURT:  Okay.  Thank you, Mr. Cunningham.

21              MR. CUNNINGHAM:  Thank you.

22              MR. ZAKIA:  Good afternoon, Your Honor.

23              THE COURT:  Good afternoon.  Welcome.

24              MR. ZAKIA:  Thank you.  Jason Zakia of White & Case

25   for the foreign representative.

1          Your Honor, in advance of the hearing, we did

2    confer with counsel to DFC, and I think we have an agreed and

3    -- path forward with regard to the evidence, so my time up

4    here should be rather brief.

5          THE COURT:  Okay.

6          MR. ZAKIA:  And I thank them for their cooperation.

7          So, Your Honor, with regard to the witness

8    testimony, we have agreed that we -- the debtors have two

9    witnesses that will testify through written directs.  And I'm

10   advised there is, neither objection, nor cross-examination.

11   So, with the Court's permission, I'll do that first.

12         THE COURT:  Yes, please.

13         MR. ZAKIA:  Okay.  Our first witness is the Foreign

14   Representative Robert Wagstaff.  Mr. Wagstaff's direct

15   testimony is set forth in the factual portions of the

16   verified petition, which is found at Docket Number 2 and is

17   identified on our exhibit list as Exhibit 1.  Mr. Wagstaff is

18   present in the courtroom, should the Court have any

19   questions.  And again, I've been advised by the objectors

20   they do not.  We would offer his verified petition at this

21   time.

22         THE COURT:  Okay.  Does anybody object to the

23   admission of Mr. Wagstaff's declaration in support of the

24   motion today?

25         (No verbal response)

1          THE COURT:  Okay.  I hear no response.  It is

2     admitted.

3          (Foreign Representative Exhibit 1 received in evidence)

4          THE COURT:  Is there anybody who would like to

5     cross-examine Mr. Wagstaff?

6          (No verbal response)

7          THE COURT:  Okay.  I hear no response.

8          MR. ZAKIA:  Thank you, Your Honor.

9          Our second witness is Juan Pablo Estrada; he is our

10    Mexican law expert.  He is virtually present, and we thank

11    the Court for permission --

12          THE COURT:  He is.

13          MR. ZAKIA:  -- allowing him to appear virtually.

14          Mr. Estrada's testimony is set forth in two

15    declarations:  His original declaration, which is found at

16    Docket Number 3 and is identified on our exhibit list as

17    Exhibit 2; and his supplemental declaration, which is Docket

18    Number 41 and is identified as Exhibit 11.

19          Mr. Estrada is available, should the Court have any

20    questions.  Again, I've been advised by counsel for the

21    objector that they do not.

22          We will -- we offer his declarations into evidence

23    at this time.

24          THE COURT:  Okay.  Does anybody object to the

25    admission of Mr. Estrada's declarations in support of the

1   motion?

2        (No verbal response)

3            THE COURT:  Okay.  I hear no response.  They are

4   admitted.

5        (Foreign Representative Exhibit 2 received in evidence)

6        (Foreign Representative Exhibit 11 received in evidence)

7            THE COURT:  Is there anybody who would like to

8   cross-examine Mr. Estrada?

9        (No verbal response)

10           THE COURT:  Okay.  I hear no response.

11           MR. ZAKIA:  Thank you, Your Honor.

12           And finally, the debtors identified 7 additional --

13  sorry -- 11 additional exhibits.  Those would be Exhibits 3

14  through 10 and 12 through 14 on our exhibit list.  Again,

15  we've advised -- consulted with counsel for the objector, and

16  they've advised that they do not object, so we would offer

17  those into evidence at this time.

18           THE COURT:  Does anybody object to the admission of

19  Foreign Representative's Exhibits 3 through 10 and 12 through

20  14?

21       (No verbal response)

22           THE COURT:  Okay.  I hear no response.  They are

23  admitted.

24       (Foreign Representative Exhibits 3 through 10 received

25  in evidence)

1    (Foreign Representative Exhibits 12 through 14 received

2    in evidence)

3         MR. ZAKIA:  With that, the debtors rest and I will

4    sit down.  Thank you very much, Your Honor.

5         THE COURT:  Thank you.  Thank you.

6         Okay.  Is there anybody else who would like to

7    offer evidence in support of the motion?

8         MR. GENTILE:  Good afternoon, Your Honor.  John

9    Gentile from Benesch, Friedlander, Coplan & Aronoff.

10         THE COURT:  Yes, welcome, Mr. Gentile.

11         MR. GENTILE:  Thank you.  Delaware counsel to the

12    United States International Development Finance Corporation.

13         We filed an objection at Docket Number 30 and a

14    short exhibit list yesterday at Docket Number 47, and we

15    submitted copies of the exhibit to chambers.

16         My co-counsel Ben Butterfield of Morrison &

17    Foerster is going to handle argument today.  And as debtor

18    counsel stated, we reached agreement on the admissibility of

19    our exhibit, as it is being offered to prove what was said by

20    the ad hoc group in that pleading and not for the truth of

21    the matter asserted; therefore, I'd like to move that exhibit

22    into evidence at this time.

23         THE COURT:  Okay.  Does anybody object to the

24    admission of the DFC's exhibit in support of their opposition

25    to the motion?

16

1          (No verbal response)

2               THE COURT:  Okay.  I hear no response.  It is

3     admitted.

4          (DFC Exhibit 1 received in evidence)

5               MR. GENTILE:  Thank you, Your Honor.

6               THE COURT:  Okay.  Is there anybody else who will

7     be offering evidence today?

8          (No verbal response)

9               THE COURT:  Okay.  I hear no response.

10              Mr. Cunningham.

11              MR. CUNNINGHAM:  Your Honor, so that completes the

12    evidence and it now turns to argument.  We'll proceed however

13    Your Honor wishes.

14              I do want to emphasize, however, as I indicated in

15    the opening, there are four requests for relief.  There are

16    three of those that are -- we have no objections to, I have

17    not seen an objection filed.

18              One is recognition of the Mexico Concurso

19    proceeding as a foreign main proceeding.  I don't believe

20    that that's been objected to, I didn't see that anywhere in

21    DFC's objection or by anybody else.

22              And I don't see any objections to the withdrawal of

23    the prior Chapter 15 case that we filed for the Mexican

24    liquidation proceeding, as well as the withdrawal of the

25    involuntary filing.

1                THE COURT:  Right.

2                MR. CUNNINGHAM:  So that I think the sole objection

3      is -- looking at the only one I can read and look at, is

4      DFC's objection to the granting a full force and effect here

5      in the territorial United States of the -- territorial

6      jurisdiction of the United States.  And that, I think, is the

7      only objection, subject to whatever the United States Trustee

8      might also want to say.

9                So do you want to hear first from the objectors and

10     then have myself and the ad hoc group counsel respond or ...

11               THE COURT:  I think that makes sense, yes.  It's a

12     good --

13               MR. CUNNINGHAM:  Okay.

14               THE COURT:  -- a good suggestion.

15               Why don't I hear from Mr. Butterfield first?  Mr.

16     Butterfield, you're a regular here.

17               MR. BUTTERFIELD:  Yeah.  Thank you, Your Honor.

18     Good to see you.

19               THE COURT:  Good to see you.

20               MR. BUTTERFIELD:  Good afternoon.  Ben Butterfield

21     of Morrison & Foerster for the U.S. International Development

22     Finance Corporation, DFC.

23               And before we begin, I'm pretty sure that whatever

24     my kids had last week, I have this week, so I'll make it

25     through, but just bear with me.

1          Okay.  Let me start with an introduction.  DFC is a

2     development finance agency of the United States.  In 2020,

3     DFC made a hundred-million-dollar loan to Credito Real.  As

4     of today, at least 96 million -- or about 96 million of

5     principal amount under the loan is outstanding.  All of the -

6     - the whole loan was funded with U.S. taxpayer dollars.

7          DFC is very concerned about how the precedent that

8     is in this plan -- and I'm talking specifically about the

9     non-consensual third-party release -- could impact the

10    development goals of the United States.  As a lender to

11    borrower in foreign jurisdictions, DFC wants to ensure that

12    U.S. taxpayer dollars are used for their intended purposes

13    and are not the subject of fraud.

14          And finally, I'll note that Neal Modi from the DFC

15    is here with us --

16          THE COURT:  Welcome.

17          MR. BUTTERFIELD:  -- this afternoon in the

18    courtroom.

19          Okay.  Your Honor, so I will start by reading the

20    release.  And you can find this in -- the release at issue,

21    and you can find this in Paragraph 4 of our objection.  And

22    I'll paraphrase a little bit because there's a lot.  But it

23    says:

24          The recognized creditors -- and those are the

25    creditors, effectively, with allowed claims in the proceeding

1    --

2              THE COURT:  Okay.

3              MR. BUTTERFIELD:  -- agree not to bring any claim,

4    effectively, you know, against the foreign debtor's

5    directors, against its officers, against its former CEO Mr.

6    Regules, and also against its shareholders.  Now this is a

7    public company and we assume the shareholder -- the shares

8    are still widely held.  So the reference to shareholders

9    there is extremely broad and probably includes former

10   management.

11             Now there appears to be a temporal limitation on

12   the release, but we think the language is vague.  It -- this

13   is not the standard from the petition date through the

14   effective date, like you'd see in an exculpation.  And I

15   asked the foreign representative's counsel if the release was

16   limited in time, and the answer I got was it says what it

17   says.  And fair enough, fair enough.  He's not the

18   determiner, the one who determines what the release means or

19   how it's interpreted, the Mexican Court is, so I understand

20   that.  But given the ambiguity, we have assumed the release

21   covers historical acts.

22             Now there's a carveout in the release, it's a

23   narrow one.  It basically carves out claims for bad acts that

24   were not disclosed to the ad hoc group when the plan was

25   being negotiated.  Now we were not part of the ad hoc group,

1    we have no idea what was disclosed; to us, that's a black

2    box.

3           And finally, the release does not -- and we were

4    surprised by this -- does not carve out claims for fraud,

5    wilful misconduct, bad faith, you know, the normal things

6    that you would expect to see.

7           THE COURT:  Well, normal things you'd expect to see

8    in --

9           MR. BUTTERFIELD:  In the United States.

10          THE COURT:  -- maybe a Chapter 11.

11          MR. BUTTERFIELD:  Yeah.

12          THE COURT:  Yeah.

13          MR. BUTTERFIELD:  So I'll admit, I think the

14   release is a little bit ambiguous, and we gave it an

15   expansive reading for the purposes of our objection.

16          The foreign representative says it's, effectively,

17   an exculpation or suggests that it's an exculpation.  I think

18   that you can see the differences between this and an

19   exculpation.

20          THE COURT:  Uh-huh.

21          MR. BUTTERFIELD:  All right.  So the DFC is

22   objecting on that basis.  Broad release, we're going to

23   interpret it broadly because it could be interpreted broadly

24   in Mexico, and we have to deal with that.  Okay.

25          So, as I see it, the analysis has two prongs:

1          The first prong is:  Does the Bankruptcy Code

2    authorize the release?

3          And the second prong is:  Does Chapter 15's public

4    policy exception apply and can you use that to --

5    notwithstanding the fact that it's authorized, can you use

6    that to deny the release.

7          Okay, question one:  Does the Bankruptcy Court

8    authorize the release?  Well, what's the statutory basis for

9    it we have?  Let's start there.  The foreign representative

10   suggests 1521 and 1507.

11         The problem is, when you look at those provisions,

12   neither expressly authorizes a non-consensual third-party

13   release, neither does.  Instead, the foreign representative

14   relies on a catchall.  So we have two catchalls:  One in 1521

15   and one in 1507.  The one in 1521 is the phrase "any

16   appropriate relief" and the one in fifty oh seven -- 1507 is

17   "additional assistance."  Those are the catchalls.  And those

18   catchalls are the hook, that's the hook, those catchalls, for

19   enforcing an extremely broad release, non-consensually, in

20   the United States.  Those are the catchalls, those are the

21   hooks.

22         So we have third-party releases, we have catchall

23   language that needs to be interpreted.  And fortunately, we

24   have a recent decision from the United States Supreme Court

25   that gives us a framework for interpreting this statutory

1    language.  And I think Your Honor knows where this is headed.

2              THE COURT:  I do.

3              MR. BUTTERFIELD:  So --

4              THE COURT:  We've been, as a profession, been

5    talking about this question for nine months.

6              MR. BUTTERFIELD:  Yeah.

7              THE COURT:  Yeah.

8              MR. BUTTERFIELD:  So the first thing I will say is

9    this:  The Supreme Court limited its ruling in Purdue to the

10   facts of that case, no dispute, no decision of whether a

11   Chapter 11 plan can include provisions that non-consensually

12   release third-party claims.

13             I'm not telling you that Purdue squarely answers

14   the question in this case, I'm not saying that.  I'm not

15   saying that -- it doesn't say that, I'll admit it doesn't say

16   that.  But what it does do is give you a framework for

17   thinking about statutory interpretation in this precise

18   context.  So let's talk about that.

19             Under Section 1123(b) -- this is Purdue.  Let's --

20   and we're going to compare.  Section 1123(b) says a plan may

21   include certain provisions, and there's a list of five

22   expressly enumerated provisions --

23             THE COURT:  Uh-huh.

24             MR. BUTTERFIELD:  -- each of which authorizes a

25   Bankruptcy Court to modify claims as between a creditor and a

1    debtor, and then there's a catchall, and the catchall says

2    the plan may include any other appropriate provision.  And

3    that's the statutory hook, that's the hook, that's the

4    catchall, that's the hook that the Purdue Debtors wanted to

5    use to release nondebtors, the Sacklers.

6          So what did Purdue say about catchalls?  Well, it

7    said, when you have a list of things the Code authorizes and

8    the list has a catchall provision, the catchall should not be

9    given the broadest possible reading, you interpret the

10   catchall in light of the statutory context.  That's the

11   constraint.  There is a constraint and the context is the

12   constraint.

13         So, there, in Purdue, the Court looked at the

14   statute and the enumerated list in the statute, and the

15   statute identified five specific items, and each one related

16   to the relationship between a creditor and a debtor.  And the

17   Court concluded we have to interpret this catchall in light

18   of the context, in light of that constraint.  And we know

19   what happened.  And I'll come back to that in a second, but I

20   want to talk about Credito Real.

21         So the foreign representative cites a litany of

22   cases in his brief.  All were decided prior to Purdue, none

23   use a Purdue framework for how to interpret the statute, so,

24   from my perspective, not relevant and, after Purdue,

25   potentially wrongly decided because we have a very clear

1    instruction from the Supreme Court about how to think about

2    statutes that are phrased in this way, in a catchall in this

3    context, very clear.  It's almost, if Purdue was not decided

4    in Chapter 11 and was, instead, just decided in Chapter 15,

5    it would be on all fours.  It's squarely -- the -- it fits

6    squarely.

7            So let's talk about Credito Real.  What do we have

8    here?  We have Chapter 15, Sections 1521 and 1507.  Neither

9    of them authorizes the relief, both have catchalls, we've

10   talked about that.

11           I'll start with 1521.  And you'll see that 1521

12   says, where necessary to effectuate the purposes of this

13   chapter and, and to protect the assets of the debtor or the

14   interests of creditors, the Court may grant any appropriate

15   relief.  That's the catchall.

16           And then it says "including."  So now we're -- now

17   we come to the enumerated list.  And this list, according to

18   Purdue, is going to help us interpret the catchall.  And each

19   item on the list concerns the debtor's assets.  In fact, 1521

20   is a short provision in the Bankruptcy Code, relatively

21   speaking.

22           THE COURT:  Uh-huh.

23           MR. BUTTERFIELD:  And the "assets of the debtor"

24   are referenced eight times.  You see it in (a), (a)(1),

25   (a)(2), (a)(3), (a)(4), (a)(5), (b), (c), over and over and

1    over and over again, you see "assets of the debtors."

2    Interesting, broad catchall, but we have context.  The

3    context, what is it focused on?  It's focused on the assets

4    of the debtor.

5              Okay.  Let's jump to 1507.  What do you see in

6    1507?  Well, right off the bat, we see the operative

7    provision (a) is limited by the entirety of Chapter 15.

8    Subject to the specific limitations stated elsewhere in this

9    chapter -- and this will be a little bit of a tangent.

10             But if there's a new concept that you want to --

11   that Congress wanted to add to the Bankruptcy Code, if

12   Congress was trying to add novelty to the Bankruptcy Code

13   that didn't exist anywhere else in the Bankruptcy Code or in

14   Chapter 15 anywhere else, drafting 101, you don't put it

15   here.  You don't constrain it with subject to the specific

16   limitations contained elsewhere in the Bankruptcy Code.

17   That's a little bit of a tangent, but I thought I'd point it

18   out.

19             THE COURT:  Uh-huh.

20             MR. BUTTERFIELD:  But what else do we see?  Well

21   fifteen seven -- 1507 says:

22             "The Court may provide additional assistance to the

23             foreign representative."

24             That's the catchall.

25             And here is our enumerated list, it's not in (a);

1   it's actually in (b), (b) tells us how, how can -- how a

2   court should consider requests for additional assistance.

3   And here, we have five numbered sub-provisions, all of which

4   concern the debtor or its creditors, the debtor or its

5   creditors; (b)(1) and (2) reference "creditors;" (b)(3) and

6   (4) reference the debtor's property, and (b)(5) references

7   the debtor itself.  So, again, broad catchall.  But the

8   context, viewed in context, as Purdue tells us, the relief is

9   focused on the creditor/debtor relationship.

10          So back to Purdue.  In Purdue, the question was

11  hey, you have this enumerated list of what a plan may

12  include, that's 1123(b).  And at the end of the list, you see

13  a catchall, any other appropriate provision, what to do about

14  the catchall.  And what does the Supreme Court do?  It does

15  the exact same analysis that we just did in 1521 and 1507.

16          And I quote.  This is from Pages 217 and 218 of the

17  U.S. Reporter:

18              "-- when Congress authorized 'appropriate' plan

19              provisions in paragraph (6), it did so only after

20              enumerating five specific sorts of provisions, all

21              of which concern the debtor -- its rights and

22              responsibilities, and its relationship with its

23              creditors."

24          Continuing:

25              "-- paragraph (6) operates to confer additional

1          authorities on the Bankruptcy Code" -- "on [the]

2          Bankruptcy Court.  But the catchall cannot be

3          fairly read to endow a bankruptcy court with the

4          'radically different'" -- "with the 'radically

5          different'" -- quote -- "'radically different power

6          to" --

7          Grant a third-party release, effectively.

8          THE COURT:  But isn't the difference here -- and

9    you know, I'm enjoying the discussion.  It's all -- none of

10   this, I think, was in your papers, so I'm kind of responding

11   to this in realtime.

12          But isn't -- I mean, the fundamental difference

13   here is that all they're asking me to do is recognize a

14   foreign order, and whatever effects it has are the effects it

15   has.  They're not asking me to grant any additional relief.

16   There's nothing else that they're asking me to do.

17          This contemplates, I think, a different set of

18   facts.  This is all, if I recognize the order, I can do other

19   stuff in addition to that.  That's what 1507 and 1521 do.

20          MR. BUTTERFIELD:  So the -- what they are asking

21   you to do is to give effect to the Mexican court order within

22   the territorial limits of the United States.

23          THE COURT:  Right.

24          MR. BUTTERFIELD:  That --

25          THE COURT:  So then doesn't that mean that the

1   issue is, if I can recognize it -- and I think there's no

2   dispute today that I can recognize the Mexican proceeding as

3   a foreign main proceeding.  But then the issue, I think, that

4   you're describing is really just a 1506 issue --

5            MR. BUTTERFIELD:  No --

6            THE COURT:  -- which is --

7            MR. BUTTERFIELD:  -- the --

8            THE COURT:  -- where your papers went.

9            MR. BUTTERFIELD:  I disagree, Your Honor.  Sorry.

10   I disagree, Your Honor.

11            The question of recognition of a foreign proceeding

12   is different from the question of recognition of a foreign

13   plan.  Okay.  Recognition of a foreign proceeding says that's

14   the foreign proceeding where this debtor should be liquidated

15   or should be reorganized, and I will defer to that Court's

16   decision about -- that Court's decisions about what happens

17   with a debtor's estates --

18            THE COURT:  Uh-huh.

19            MR. BUTTERFIELD:  -- and how its creditor claims

20   are adjusted, right?

21            When that credit -- when the foreign representative

22   of that proceeding comes to the United States, recognize --

23   just recognizing the court order is not a form of relief that

24   Chapter 15 allows.  Recognition is not a form of relief.

25            Chapter 15 tells you what kind of relief you can

1    offer, and it says it -- when it -- in the period between

2    filing the petition and recognition, you have the relief

3    afforded by 1520.  And after -- thereafter, once you do

4    recognize it, you can offer the relief in fifteen -- sorry,

5    1519.  After, you can offer the relief in 1520.  If you want

6    to go beyond the relief in 1520, which is expressly

7    enumerated, then you look to 1521 and 1507.  The relief that

8    you grant, including recognition of what that court order

9    says, has to fit within 1519, 1520, 1521, or 1507.  And if it

10   doesn't, you can't do it.

11         There's no such thing as broad recognition of a

12   court order, whatever it says, it says.  It has to fit.  And

13   it doesn't, and they're not arguing it does, fit within 1519

14   or 1520.  So what's left?  1521 or 1507, and that's what

15   we're walking through.

16         And they're also not arguing that it fits within

17   any of the enumerated provisions of 1521.  And they're not

18   arguing that any of the considerations in 1507 are relevant

19   to the narrow question of should you grant a third-party

20   release because they don't apply.  They're like off topic.

21         So the question is:  Given that statutory con --

22   the statutory context with those enumerated lists that are

23   telling you, according to the framework in Purdue, how to

24   think about the catchall, what do you do?  How do you think

25   about the catchall?  And you heard how the Supreme Court in

1     Purdue thought about the catchall.  It said the catchall

2     cannot be meant, cannot be credibly read to expand the relief

3     that you are authorized to give beyond the context that the

4     enumerated list provides, cannot be credibly read.  So, if

5     they come here with an order that asks you to do something

6     you don't have the power to do, you have to say,

7     respectfully, I cannot, because I do not have the statutory

8     authority to do that.

9          This is the framework we have to use when we

10    interpret catchalls in the Bankruptcy Code.  And the decision

11    of the foreign representative -- the decisions they are

12    citing, none of them use this framework.  Purdue does.  When

13    you apply Purdue, the result is clear, there is no other

14    statutory basis in Chapter 15 to recognize a plan.  It's one

15    of these four provisions.  And they tell you exactly what you

16    can and cannot do.

17         They say you can impose a stay.

18         They say you can direct creditors back to the

19    foreign main proceeding.

20         They say you can do -- you basically can do

21    whatever the foreign court asks you to do with respect to the

22    relationship between creditors and debtors, so long as due

23    process was followed in the foreign jurisdiction.  You have

24    carte blanche authority, I would acknowledge.

25         What you do -- what you have no authority to do is

1   release nondebtor claims against nondebtors because this

2   catchall is the only -- these two catchalls are the only

3   possible source, and you can't read them that broadly.

4          Okay.  So what else does Purdue say that can be

5   relevant here?  Well, the foreign representative takes the

6   position that Chapter 15 -- in Chapter 15, comity is the

7   overriding principle, comity, comity, comity.  If what you

8   are doing is granting comity, then you can do it.  That's not

9   true, it's not true.

10         So I'll read again from Purdue.  Purdue says:

11             " -- there is an obvious difficulty with this

12             approach" --

13         This approach is taking one principle that is

14   embodied in the Bankruptcy Code and making it the overriding

15   principle.  And that is that:

16             "As this Court has long recognized, '[n]o statute

17             pursues a single policy [goal] at all costs.'"

18             Right?

19         And then, second, it says -- and this is where --

20   and this is where the Court in Purdue was considering the

21   policy implications of not granting it.  It said:

22             "Both sides of this policy debate may have their

23             points."

24         This is 226, both sides have their points.

25             "But, in the end, we are the wrong audience for

1          them ... our only proper task is to interpret ...

2          the law as we find it; and nothing in [the] present

3          law authorizes the ... discharge."

4     Why did it -- why is it nothing in the present law?

5  Because the catchall has to be constrained by the context.

6  That's why the law didn't authorize it because the Court

7  looked to the only place in the statute that it had statutory

8  authority to grant the relief, and it interpreted it in the

9  context of the statute, and it was constrained.

10     Your Honor, the same logic applies here.

11  Ultimately, this is a very straightforward analysis.  Our job

12  is to interpret the law as Congress wrote it.  If we use

13  Purdue's framework, the relief in 1521 and 1507 is

14  constrained.  The context in both of those statutes is the

15  relationship between a debtor and its creditors.  The relief

16  lives in that context, that's where it lives.  That's where

17  the statutory analysis takes us.

18     The foreign representative wants to focus on

19  policy.  Purdue is clear, the proper focus is on the law, not

20  policy.  If the law doesn't give you permission or authority

21  to grant the comity that you want to grant, you can't grant

22  it because the statute controls, not the policy, under

23  Pursue.

24     THE COURT:  Most of your objection was about

25  policy.

1          MR. BUTTERFIELD:  Yeah, so that's what we're going

2     to talk about next, the policy exception.

3          THE COURT:  Okay.

4          MR. BUTTERFIELD:  Okay.  So fifteen -- I think --

5     look, ultimately, the goal here is to get the decision right,

6     right?  The -- so I think the framework that Purdue gives us

7     has to be considered when you decide it because this is a

8     question of statutory interpretation, and it's a question of

9     interpreting a very specific type of statute:  An enumerated

10     list with a catchall.  And we happen to have a decision that

11     is topically on point, doesn't really matter, topically on

12     point, but has this exact statutory framework, which is an

13     enumerated list and then a catchall, and tells you exactly

14     what to do with it.

15          All right.  Second argument, and I'll promise I'll

16     keep this brief.  And this is --

17          THE COURT:  That's okay.

18          MR. BUTTERFIELD:  Yeah.

19          THE COURT:  We've got time.

20          MR. BUTTERFIELD:  So does Chapter 15's public

21     policy exception apply?  Second question.  And I want to be

22     clear because we just talked about public policy, and I think

23     you were picking up on this.  The foreign representative

24     wants to use public policy to expand the statute.  There is a

25     public policy exception in the statute.  The purpose of that

1    exception is to narrow the relief, not expand it.  So they're

2    telling you to look to the public policy to expand.  We say

3    no, don't expand, just stick with what the statute says.  The

4    statute gives us a basis to narrow, so now we're going to

5    talk about how you can narrow it.

6            So the public policy exception is found in 1506.  I

7    won't read it, we all know what it says.

8            DFC believes the third-party releases are

9    manifestly contrary to public policy.  The plan non-

10   consensually releases third-party direct claims against

11   officers, directors, and shareholders -- shareholders, the

12   whole company -- for everything, including fraud.

13           And I challenge the foreign representative to

14   identify a practice in the United States that does that,

15   right?  If you look at exculpations, you won't find it.

16   Exculpations are always limited to estate fiduciaries and

17   have carveouts for fraud.  Third-party release provisions,

18   you know, the consensual -- quote/unquote, "consensual" and

19   the non-consensual have carveouts for fraud.  Even under

20   Continental, you know, when -- which granted non-consensual

21   third-party releases, or at least contemplated it was

22   possible, there was a -- there was a carveout for fraud and

23   it had to be justified.

24           So my last point is -- and I think this really

25   doesn't matter, from a legal perspective, but I think it's

1    important to understand the context.  It really tells you why

2    we're here.  And I want to be careful because the U.S. is an

3    arm of the U.S. Government -- sorry -- the DFC is an arm of

4    the U.S. Government and has police power.  And I don't know

5    what the U.S. is going to do here, in that regard.

6              But this is not an ordinary reorganization.  This

7    is not plain vanilla.  I believe counsel kind of glossed over

8    the reason why it took us four years to get here.  But the ad

9    hoc group said a lot about it in their initial objection to

10   recognition, so let's see what they said.  So this is Case

11   22-10630, Docket 44.  This is in -- yeah, exactly.  So I'll

12   start from Paragraph 3:

13              "This Court should not defer" --

14              Quote:

15              "This Court should not defer to a deeply flawed

16              Mexican liquidation that only facilitates Mr.

17              Romanos' attempt to avoid accountability for his

18              misconduct and the putative debtor's accounting

19              fraud."

20              Paragraph 49:

21              "The Mexican liquidation was commenced by Mr.

22              Romanos for the purpose of avoiding personal

23              criminal and civil liability."

24              Skipping down:

25              "A court of equity should not permit such

1    fraudulent conduct to succeed because it could

2    result in Mr. Romanos escaping from liability for

3    his actions."

4    Paragraph 63:

5    "Mr. Romanos commenced the Mexican liquidation to

6    avoid judicial scrutiny of the fraudulent transfers

7    he authorized and the significant accounting

8    improprieties that occurred under his leadership."

9    Six -- skipping down:

10   "In commencing the Mexican liquidation, Mr. Romanos

11   acted solely for his own benefit, destroying a

12   valuable operating business to the detriment of the

13   putative debtors."

14   Skipping down:

15   "This legal tactic designed to frustrate creditors

16   and protect an insider and their expense should not

17   be validated."

18   And this is how the ad hoc group concludes:

19   "Accordingly, the Court should deny recognition

20   because it would be manifestly contrary to public

21   policy."

22   So that's the ad hoc group, Your Honor, their own

23   words.

24   And I'll tell you what the record here is missing.

25   It is missing any assurance that those concerns voiced by the

1    ad hoc group have been addressed.  It is missing any

2    investigation into the claims, including the claims for

3    fraud.

4              And look, I don't fault --

5              THE COURT:  Well, the -- well, this was admitted --

6              MR. BUTTERFIELD:  Yeah.

7              THE COURT:  -- only to say that the ad hoc

8    committee says -- the ad hoc group says this --

9              MR. BUTTERFIELD:  Uh-huh.

10             THE COURT:  -- right?  Their allegations are not --

11             MR. BUTTERFIELD:  Fact.

12             THE COURT:  They're not evidence --

13             MR. BUTTERFIELD:  They're not fact.

14             THE COURT:  -- of anything --

15             MR. BUTTERFIELD:  Yeah.

16             THE COURT:  -- just that --

17             MR. BUTTERFIELD:  They --

18             THE COURT:  -- they said it, right?

19             MR. BUTTERFIELD:  They made -- they felt the need

20   to make the allegations.

21             THE COURT:  It's evidence that they said it.

22             MR. BUTTERFIELD:  Yeah.

23             THE COURT:  That's all that that was admitted for -

24   -

25             MR. BUTTERFIELD:  Yeah.  They said it --

1          THE COURT:  -- and --

2          MR. BUTTERFIELD:  -- in a public pleading.

3          THE COURT:  -- no other context on that.

4          MR. BUTTERFIELD:  Sure.  Sure, sure, sure.  But it

5    can't be ignored.  I don't think it can be ignored that a --

6    holders of a billion dollars of notes came into this court

7    and made those allegations about a debtor that's now seeking

8    to have claims against its insiders released, including

9    claims for fraud.  It can't be ignored.

10          And I don't fault the ad hoc group for falling in

11    line.  They were dealing with a recalcitrant borrower.  They

12    had no control over what was going on.  It was a very opaque

13    proceeding in Mexico.  They had to get it to stop, it had to

14    stop.  They had, you know, creditors, local creditors who

15    were being paid ahead of them and they had to cut their

16    losses, so they signed a deal.  I do not blame them.  You

17    know, they're economically rational actors.  The U.S. has

18    other motivations, including protecting the fraudulent use of

19    taxpayer funds.

20          So, Your Honor, that's our presentation.  We don't

21    think there's a -- we think there's a clear basis to apply

22    the public policy exception because the third-party releases

23    violate public policy.  That's all, Your Honor.  Thank you.

24          THE COURT:  Thank you very much, Mr. Butterfield.

25          Would the U.S. Trustee like to be heard?  Mr. Fox.

1    Good afternoon.

2            MR. FOX:  Good afternoon, Your Honor.  May it

3    please the Court, Tim Fox on behalf of the United States

4    Trustee.

5            I'm just rising to first indicate that, with

6    respect to some of the narrower issues, the foreign debtor's

7    counsel's representations with respect to the injunction

8    language and language with respect to what was originally

9    identified as a release and exculpation, but is now

10   structured as a limitation of liability, addressed those

11   informal comments and then items that were memorialized in my

12   office's reservation of rights.

13           However, that leaves the big picture question that

14   counsel for DFC was just articulating to Your Honor.  And

15   with respect to that issue, again, the U.S. Trustee filed its

16   reservation of rights to ensure that this Court's order does

17   not authorize non-consensual third-party releases.

18           Again, this is a complex issue and one that, when

19   you layer on the additional foreign proceeding, that the U.S.

20   Trustee has serious concerns about and wants to ensure that

21   parties' rights, like DFC, are protected in front of Your

22   Honor and Your Honor's colleagues when Chapter 15 matters are

23   filed here in the District of Delaware.

24           I just want to briefly touch on two items that were

25   in the reply from the foreign debtor's counsel --

1          THE COURT:  Uh-huh.

2          MR. FOX:  -- and that was citations to the Nexii

3     Building Products case and to the Mega Newco cases.

4          I'll start with Mega Newco, which has a very

5     strange fact pattern, where a U.K. scheme was implemented, in

6     order to adjust debt for, I believe it was a Mexican entity,

7     where they were unable to get agreement of parties at the

8     lower level and formed a new company, in order to seek to

9     adjust that debt.  And I believe there were certain sanctions

10    issues that existed that precluded addressing the debt at the

11    original entity.

12         THE COURT:  Uh-huh.

13         MR. FOX:  I'm sure that, if I've misstated any of

14    those facts, that foreign debtor's counsel will correct me as

15    part of their presentation.  But I just wanted to emphasize

16    that that may not be the most analogous situation to address

17    issues that are currently pending with respect to Credito

18    Real.

19         And then, second, with respect to the Nexii

20    Building Products case, that is a matter that I am the trial

21    attorney assigned to, as well, from my office.

22         And apologies, Your Honor, would you like me to

23    direct you to the specific paragraphs of the reply on that?

24         THE COURT:  I'm just trying to find the reply in

25    this binder without success.  So, yeah, if you could help me

1    please.

2              MR. FOX:  Okay.  Just bear with me.

3         (Pause in proceedings)

4              MR. FOX:  Those are cited at Paragraph 10 of the

5    reply, which is at Docket Item 39.

6              And with respect to Nexii Building Products, I just

7    want to highlight --

8              THE COURT:  Yeah.

9              MR. FOX:  -- that the citation for that docket

10   entry is July 22nd, 2024, which Your Honor will be aware is

11   about a month after Purdue was issued.

12             THE COURT:  Yes.

13             MR. FOX:  And I believe that was an uncontested

14   order, so there hadn't been any party that objected in a

15   similar posture as DFC is objecting here today, and the U.S.

16   Trustee is reserving rights on this issue.

17             THE COURT:  Yeah.  In Nexii, it was uncontested.

18   And in Mega Newco, by the time that Judge Wiles wrote his

19   opinion, the issue of non-consensual third-party releases was

20   not a live issue, and he expressly stated in that opinion, as

21   I recall, that he wasn't addressing it.

22             MR. BOTTER:  Your Honor, David Botter, Cleary

23   Gottlieb.  I'm actually counsel of record in Mega Newco.

24             THE COURT:  Then you know better than I do.

25             MR. BOTTER:  And Your Honor, we had resolved any

1    issues on -- there were third-party releases in the scheme.

2              THE COURT:  Yes.

3              MR. BOTTER:  The Court recognized the English

4    scheme order --

5              THE COURT:  Uh-huh.

6              MR. BOTTER:  -- as we are asking the Court to do

7    with respect to the Mexican order.  But we had resolved any

8    issues that the U.S. Trustee had presented in that case in

9    the Southern District.

10             THE COURT:  Right.  Right.  Thank you very much,

11   Mr. Botter.

12             MR. BOTTER:  Thank you, Your Honor.

13             MR. FOX:  So, with that, Your Honor, again, the

14   U.S. Trustee would rest on its reservation of rights and the

15   further arguments of the parties.  We appreciate the time to

16   weigh in on the issue.  And if Your Honor has any further

17   questions of me, I'm happy to address those to the best of my

18   ability.

19             THE COURT:  Okay.  I don't, but thank you for your

20   comments, Mr. Fox.

21             MR. FOX:  Thank you.

22             THE COURT:  Okay.  Let me hear from the foreign

23   representative.

24             MR. CUNNINGHAM:  Thank you, Your Honor.  John

25   Cunningham, White & Case, on behalf of the foreign

1    representative.

2         Your Honor made a bunch of comments about the

3    relief that we're seeking, and it's exactly as Your Honor

4    described.  All we are asking for is for the plan, including

5    its release provision, to be given full force and effect here

6    in the United States, it's only that.  And I would like to

7    note -- you know, I'm going to come back to the 1506 public

8    policy exception and Purdue.  But I think it's important to

9    look at this in context.

10        DFC is a creditor here, is an active participant in

11   all of these cases, or at least in Mexico.  I didn't see them

12   appear, really, in the Chapter 15.  But they can't really

13   ignore the fact that, in -- for example, I started with the

14   update I gave Your Honor at the status conference.  We filed

15   the restructuring support agreement and the plan termsheet

16   for the Concurso plan, and both documents clearly reflect

17   that the Concurso plan was going to have customary

18   exculpations and releases and gave the broad categories that

19   ultimately wound up getting negotiated.  So they were clearly

20   on notice that this was coming down the road.

21        And then, of course, they were a creditor in the

22   Concurso proceeding.  They weren't just watching; they were

23   actively objecting.  Unfortunately, they've never objected at

24   all to this plan provision in front of the Concurso Court.

25   In fact, in Paragraph 3 of their objection, they state:

1          "On October 6th, 2023, foreign debtor commenced a

2          Concurso proceeding in the" -- "in Mexico seeking

3          approval of the Concurso plan.  On March 20th,

4          2024, over DFC's written objections, the Mexican

5          Court overseeing the Concurso proceeding entered

6          judgment allowing and establishing the ranking and

7          priority of claims against the foreign debtor.  The

8          claims order identified DFC as a recognized

9          creditor, although DFC believes the claim order

10         improperly characterized DFC's claim as an

11         unsecured claim, rather than a secured claim.  DFC

12         subsequently filed an appeal of the claims order."

13      That's the objection that they raised, no objection

14  to the scope of the plan releases whatsoever.  They were

15  upset that they're being treated like the 2 billion of notes

16  claims, as unsecured creditors, and they're going to get the

17  same treatment as the notes claims.  They wanted to be a

18  secured creditor.  They argued, they litigated that, they

19  lost.  They're appealing that.  Those appeals will continue.

20      We're aware of they've also appealed the order and

21  are now on appeal for the first time -- they didn't raise

22  this in front of the Concurso Court -- they're raising on

23  appeal now the plan releases.  And quite frankly, the entry

24  of the -- Your Honor's order giving full force and effect to

25  this plan won't affect that appeal in any way.  And to the

1    extent the Mexican Appellate Courts agree with DFC's

2    arguments and make any modifications whatsoever to the plan,

3    it will self -- be self, you know, effective, it will fix

4    itself because we're only asking for what's been approved and

5    what -- by the Mexican Courts, pretty standard relief.

6            So, in my view, this is clearly the DFC -- they're

7    upset with the Mexican Court's decisions, they're upset that

8    they're appealing.  So now this is another venue for them to

9    make attacks they've never asserted to any court, that they

10   want to peel back the releases, potentially go against third

11   parties.  You've heard them say we want to borrow from

12   language that -- and "allegations," as Your Honor correctly

13   called it, that the ad hoc noteholder group had alleged, you

14   know, the throes of our fighting at that time.  They were

15   allegations, no proof.

16           But they're trying to -- in my view and based on,

17   you know, our discussions, they want an avenue upon which the

18   United States, on behalf of this claim, wants to go out and

19   start a roving commission and basically attack parties who

20   are third parties, but they're shareholders, they're our CEO.

21   They want to be able to go out and start new potential claims

22   to create pressure, in my view, on whatever they're doing in

23   Mexico.

24           Look, they can do what they want in Mexico.  We're

25   asking for what I call "standard, customary relief" here in a

1   Chapter 15 case.  And that brings us back to now, you know,

2   what is -- and by the way, I should have mentioned, you know,

3   our Mexican law expert gave Your Honor a supplemental

4   declaration.  I won't go into it.  It's Document 41.

5   Paragraphs 15, 16, and 17 made clear that these -- the extent

6   of the releases here are not inconsistent with what Mexican

7   law allows, it's entirely appropriate.  If DFC believed that

8   these were inappropriate and should have been tailored back,

9   they could have made those arguments; again, they didn't.

10  But this is unrebutted testimony.  You don't even hear

11  testimony from them.

12          I did pick up one comment that they made about what

13  the noteholders had filed.  They referenced potential

14  criminal proceedings.  No one is looking to exculpate or

15  release anybody from criminal proceedings.

16          THE COURT:  No, these are just civil releases.

17          MR. CUNNINGHAM:  Correct.

18          THE COURT:  Yeah.

19          MR. CUNNINGHAM:  That's exactly right.  And I can

20  make that record clear.  If DFC believes there's criminal

21  liability of anybody, that's not -- we're not seeking any

22  relief from this Court with respect to that.

23          So we come back down to the main event.  And I

24  agree, we're now looking at U.S. law.  But in going through

25  that, you're looking at Chapter 15.  And when he says you

1    need a statutory hook, you know, pointing to Purdue, and that

2    Purdue was very much focused on, you know, saying the

3    carveouts in 1523 or the catchall provisions are broad and

4    they got to be tailored back, the answer is pretty clear.

5    The Supreme Court made it very clear.

6            That was -- dealt with Chapter 11.  Chapter 11, as

7    they noted, there were -- there's ability to give non-

8    consensual third-party releases in the context of asbestos

9    cases.  Congress knew when to do it, they did it there.  They

10   could have expanded it further in Chapter 11; they didn't do

11   it.  And the Supreme Court says we have to take notice of

12   that because there's another statutory hook where we see

13   Congress was explicit, so we're not going to take a catchall

14   to take out where Congress has already been explicit.

15           In Chapter 15, there is an explicit prohibition,

16   it's Section 1506.  The remaining provisions that we cite,

17   and which courts, over and over and over again, have approved

18   foreign insolvency plans that have, you know, these third-

19   party releases, they look to -- fundamentally, to comity.

20   But then they have to look, ultimately, to the safety valve

21   that Congress put in, which is Section 1506, which says:

22               "Nothing in this chapter prevents the Court from

23               refusing to take an action governed by this chapter

24               if the action would be manifestly contrary to the

25               public policy of the United States."

1          No other court, Your Honor -- you would be the

2    first one to find that language in a foreign insolvency plan

3    that had been approved by third-party creditors -- and I'm

4    not talking about Vitro because Vitro, the Fifth Circuit in

5    that case, one, didn't even apply 1506; and, two, dealt with

6    an extreme set of facts.  That was insider claims that were

7    being used to cram down bondholder claims.  You know, it

8    involved, basically, a release of -- a non-consensual release

9    of guarantee claims by subsidiaries of Vitro, including U.S.

10   subsidiary guarantees, that had -- and saying that that -- so

11   it was egregious facts.  I know because my firm was also

12   involved, initially, in the Vitro case on behalf of the

13   bondholders.

14          So we're back to square one here.  I don't think

15   1506, manifestly contrary to public policy, they've expressed

16   any policy by any court where that has been applied here to

17   prevent this paragraph that's in the plan from being given.

18   As Your Honor said, you're just giving effectiveness here in

19   the United States to that plan provision.

20          They want to, basically, litigate what they never

21   litigated in front of the Mexican Court, the court of first

22   instance, that this was overly broad, and that -- you know,

23   they didn't even ask that court to tailor it back.  So that's

24   a decision that they made.

25          We don't believe that there is anything here in the

1    record, no testimony, no other evidence.  They're waving a

2    bunch of allegations, not even by them, but by Mr. Botter's

3    clients, and he can discuss this, as well.

4         But this was clearly a very large case in which it

5    went the right way.  There were negotiations with the lion's

6    share of the creditors here, the unsecured creditors

7    represented by the bondholders.  And these were narrowly

8    tailored, but agreed to, exculpation releases as part of a

9    global restructuring of a foreign debtor.  We found no case

10   on point, in which a court has denied such a negotiated

11   result, and we believe Your Honor should grant the relief.

12        THE COURT:  As I think I understand the arguments

13   that Mr. Butterfield put forth today -- and I'll let Mr.

14   Butterfield respond to it later, too -- but I think that what

15   I'm hearing is that, within Chapter 15, I have to find the

16   authority for whatever the foreign order that I'm going to

17   recognize provides.  Is that the case?  Do I have to find a

18   separate source of authority within Chapter 15?

19        MR. CUNNINGHAM:  I think the provisions make clear

20   that you have the broad authority to give appropriate relief.

21   Yes, Your Honor is determining is this appropriate, but we're

22   giving to you the full plan.  And we don't believe that there

23   is any -- so the answer is I agree with him, the issue of

24   releases is not covered in Chapter 15.  But that is because,

25   in the nature of comity, we do have cases that show where

1    these types of releases have been routinely approved by

2    Bankruptcy Courts, using the Sections 1506, 1507, 1517 and

3    the like.  So we do believe Your Honor has that authority.

4           It's not a case where, like in 105, you need the

5    statutory hook to grant the relief.  You have the discretion

6    to grant the relief.  The hook that Congress gave in dealing

7    with exercising comity isn't manifestly contrary to public

8    policy, with respect to the particular facts of this case.

9           And we believe, Your Honor, that this is -- again,

10   if you look at the testimony of Mr. Estrada in his

11   supplemental declaration and those provisions, I think it's

12   clear that these are customary.  Again, there was no surprise

13   by anybody, it was put in the restructuring support agreement

14   filed with this Court.  Never raised in Mexico, raised for

15   the first time here.

16          We believe that this is a novel argument that says

17   you need to go and find another provision.  I would say it's

18   the opposite, 1506 is the safety valve to instruct Your Honor

19   no, on that one, you're not allowed to because it's

20   manifestly contrary to public policy.

21          THE COURT:  Chapter 15 is largely about comity,

22   right?

23          MR. CUNNINGHAM:  Absolutely.

24          THE COURT:  Where does comity end and the

25   substantive provisions of Chapter 15 begin?  In other words,

1    if some authority is not provided under Chapter 15, what are

2    the limits on my ability to simply recognize an order under

3    principles of comity?  If that question makes any sense at

4    all.

5            MR. CUNNINGHAM:  I think -- it does make sense,

6    Your Honor.  I think, in the first instance, it is Your

7    Honor's discretion, taking into account all available facts

8    here.

9            Our concern here is, if you start tailoring this

10   back and giving this unsecured creditor an ability to go out

11   and be a roving commission to go start prosecuting claims

12   using the full authority of the Department of Justice, that

13   this is going to be a disruption to the Mexican proceedings.

14   We -- that's what I, standing here today, forecast is going

15   to be the big problem of opening that Pandora's Box.  So it's

16   still Your Honor's discretion, we understand that.

17           The one element of Your Honor's discretion that

18   Congress specifically said you can't do is if it's manifestly

19   contrary to U.S. policy.  And again, you know, they're saying

20   we're going to go after fraud.  Well, again, if it's

21   criminal, they're free to do that.  There's nothing that

22   we're asking from Your Honor today to protect anybody with

23   respect to criminal action.

24           But civil fraud is something they should have

25   raised.  Obviously, it's still the same amount of their

1    claim.  I don't know where they're going with that, other

2    than trying to now pursue third parties who can have

3    indemnity claims, et cetera.  This is why this is a

4    settlement that was incorporated in a plan, voted on by

5    creditors, approved by the Mexican Court, and never even

6    raised that they were, you know, overly broad.

7              THE COURT:  Well, is releasing fraud manifestly

8    contrary to the public policy of the United States?

9              MR. CUNNINGHAM:  I would argue, Your Honor, civil

10   fraud, the answer is no, especially in the context of this,

11   if it's fraud in connection with the underlying claim and the

12   case here.

13             I -- you know, to say you're going to have a

14   carveout for fraud, just, you know, parties use that as the

15   next level of attack in just saying we believe there was

16   fraud, fraud in the inducement, fraud in anything.  And you

17   know, it's just -- in this case, it's just fraud, any and all

18   claims, you know, here against the shareholders, related to

19   these -- this debtor.

20             I mean, it's a single debtor, multi billions

21   dollars of claims, much of it, you know, as I mentioned, you

22   know, under New York bonds.  You know, how far does this go?

23   And it involves other parties who are getting releases, the

24   ad hoc group is getting releases, because they all were

25   negotiated in saying here's the final result.

1              THE COURT:  Okay.  Okay.  Thank you.

2              MR. CUNNINGHAM:  Thank you.

3              THE COURT:  Let me hear from Mr. Botter, please.

4              MR. BOTTER:  Good afternoon, Your Honor.

5              THE COURT:  Good afternoon, Mr. Botter.

6              MR. BOTTER:  David Botter, Cleary, Gottlieb, Steen

7    & Hamilton on behalf of the ad hoc group.

8              And Your Honor, I'm going to be brief.  I want to

9    talk a bit about the facts of the case, not necessarily the

10   policy or the legal arguments.  I think they've been covered

11   incredibly well.

12             Before we got this objection or the two -- the

13   reservation of rights and the objection, Your Honor, I had

14   planned to come to Your Honor and say this is what

15   restructuring is supposed to be like.  Frankly, we have cases

16   all the time that begin hotly contested; and then,

17   ultimately, the parties get to the table and they work out a

18   deal.

19             And Mr. Butterfield read the remarks from the

20   pleadings that we filed, and it was as hotly contested as

21   they get.  And frankly, Your Honor can see that from the

22   record of these cases.

23             We filed an involuntary 11.  How often does that

24   happen?  Not that often.  We contested their Chapter 15

25   hotly.  And then everything stopped and sanity prevailed and

1   we got down to a restructuring discussion and, ultimately, we

2   got to a restructuring deal.  And it took a lot.  It took a

3   lot to negotiate the deal and it took a lot to effectuate the

4   deal.

5           And it's clear as day that this deal was to be done

6   in Mexico.  This is a Mexican company.  Yes, we had a U.S.

7   business, it was a small U.S. business.  But comity is

8   clearly in Mexico and all the parties were in Mexico.  Yes,

9   we had New York law debt, but this was a Mexican deal, to be

10  done in Mexico.  And we availed ourselves very early on in a

11  prepack process in the Concurso Court, which had been done

12  rarely before.  And we actually got to the result that we

13  were supposed to get to, which was a deal which preserved

14  value for the creditors of these companies, plainly and

15  simply.  That's the way it's supposed to work, Your Honor.

16          And as Mr. Cunningham said, DFC was involved in

17  this process.  They, as Mr. Cunningham said, did not contest,

18  initially, at the trial court, the release issue.  It's only

19  upon appeal.  The issue that they contested at the trial

20  court was the treatment of them as an unsecured creditor.

21  Unfortunately for them, they had a -- what they call a

22  "springing lien."  It was unperfected, just like we would be

23  if 544 came into play, that's what happened in Mexico, and

24  they were an unsecured creditor.  They'll appeal that issue

25  and they have -- and there is no stay in place, and they can

1    appeal and we'll see what happens.

2          But Your Honor, we think that we got exactly to

3    where we're supposed to be.  And all we're asking you to do

4    is to recognize that order, the Mexican court order, which

5    puts in place the entirety of the deal that we cut over the

6    course of multiple years of negotiations.  Is part of it a

7    release?  Is part of it an injunction against the

8    commencement of actions?  Of course it is.  That's what we

9    see in deals that we have in this jurisdiction, as well as

10   many other jurisdictions.  That's all we're -- and that's

11   what was allowed by the Mexican Court.  And all we're asking

12   for you to do is do exactly -- is recognize exactly what was

13   allowed by the Mexican Court under Mexican law.

14         Two more points, Your Honor.  As Mr. Cunningham

15   said, if the appeals change the outcome, then the recognition

16   of that order will change because you'll be recognizing a

17   revised or, or the recognition will go away, if, in fact, the

18   order goes away.  And in fact, there's a mechanism under

19   Chapter 15, which is set forth in 1507(d), that, in fact, Mr.

20   Butterfield and DFC could bring to change that, if, in fact,

21   it doesn't -- it is not self-effectuating.  So that's not the

22   last.

23         The last point was going to the question that Your

24   Honor raised with Mr. Cunningham about a separate statutory

25   basis.  And I don't know there is, but there is a provision

1    that Mr. Butterfield referred to early on in his argument,

2    and he paraphrased, and I think it's important to round out

3    my discussion.  It's 1521, and it says:

4              "Upon recognition of a foreign proceeding, whether

5              main or non-main" --

6         Here, obviously, we have main.

7              "-- where necessary to effectuate the purpose of

8              this chapter" --

9         And I think the overriding purpose of this chapter

10   is comity, which is, I think --

11             THE COURT:  Uh-huh.

12             MR. BOTTER:  I don't think there's any disagreement

13   as to that.

14             "-- and to protect the assets of the debtor" --

15             This is where Mr. Butterfield stopped.

16             "-- or the interest of creditors."

17        And I think it's important.

18        And then you go to the catchall, which is set forth

19   in (7), and that could be, frankly, where the statutory basis

20   is.

21        We represented, in addition to the bondholders,

22   ultimately, all of the unsecured creditors became part of our

23   group.  We had billions of dollars of unsecured claims that

24   voted in favor of this plan.  In order to effectuate the

25   Concurso proceeding, we had to get in excess of 50 percent

1    vote -- specifically voting in favor of the plan, not people

2    on the sidelines.  We actually had to get 50 percent, in

3    dollar amount, actually voting in favor of the plan to pass

4    this plan under Mexican law, and we did that.  And it was

5    made up of, not only bondholders, but all sorts of other

6    banking institutions, small creditors, large creditors.  And

7    this was part of the deal.

8            And Your Honor, I think where we get to, at the end

9    of the day, is that this is exactly how Chapter 15 is

10   supposed to work.  This is how the restructuring process is

11   supposed to work.  If this was a purely U.S. deal, would we

12   have other issues?  Certainly.  I understand what the Supreme

13   Court has said with respect to Chapter 11.  That's not what

14   we're talking about here today.  Thank you, Your Honor.

15           THE COURT:  Thank you, Mr. Botter.

16           Anybody else before I return to Mr. Butterfield?

17      (No verbal response)

18           THE COURT:  Okay.  Mr. Butterfield.

19           MR. BUTTERFIELD:  Thank you, Your Honor.  Ben

20   Butterfield, Morrison & Foerster, for DFC.

21           Okay.  I'm going to keep this -- I promise I'll

22   keep this brief.  They don't dispute the fact that you need

23   an express statutory basis to effectuate the foreign plan,

24   neither of them disputed it.  Those bases are 1507 or 1521.

25   Those are the only possible bases.

1          So, within 1507 and 1521, you have to find a

2    statutory hook to recognize the third-party releases.  They

3    are telling you that they're relying on the catchall.

4    They're not relying on any of the express provisions, they

5    have to be relying on the catchall.  I think Mr. Cunningham

6    said he's relying on the catchall.

7          What you are being asked is what -- is how that

8    catchall should be interpreted.  Purdue gives you a framework

9    for interpreting the catchall.  It's very clear.  If you

10   compare it and put them side by side, the statues are, in

11   form and in structure, almost identical.  So the question is:

12   Should you use the framework or not?  And I think, if you --

13   if this issue was put to the Supreme Court, they would use

14   the framework.  And it seems like that should be our approach

15   here.

16         Now they're telling you business as usual, business

17   as usual, this is comity, comity, comity.  And I think, when

18   the Supreme Court interpreted -- when the Supreme Court ruled

19   on Purdue, they gave courts a wake-up call; they gave courts

20   a wake-up call as to what you can do with the Bankruptcy Code

21   and provisions that, on their face, appear broad, but, in

22   context, are much more constrained.

23         And so, you know, I don't disagree that comity is

24   one of the purposes of the Code.  But if you look at these

25   provisions and you hold them side by side with 1123(b),

1    there's -- it's inescapable that you have to interpret it the

2    same way.  And if Congress wanted to adjust relationships

3    between nondebtors and other nondebtors, it would have

4    referenced nondebtors in these provisions and it doesn't; it

5    only references creditors.  What is a "creditor"?  A creditor

6    is a party with a claim against a debtor.  It references

7    debtors.  It references debtors' assets.  So you're

8    introducing a completely new concept to these provisions that

9    doesn't exist anywhere in the text.

10          The basis is historical practice, right?  That's

11   the basis.  But Purdue is a different paradigm for thinking

12   about the Code.  And the Court was as clear as day as to how

13   you interpret catchall provisions like this, it told you

14   exactly how to interpret it.  So you just have to make a

15   choice:  Is it historical practice or is it the Purdue

16   framework?  So, you know, I'll stop with that.

17          THE COURT:  Well, let me ask you this.  If 1521 and

18   1507 tell me everything I need to know about the auhtority of

19   this Court, why is 1506 there?

20          MR. BUTTERFIELD:  Because sometimes, under

21   extraordinary circumstances, the Court -- Congress was

22   concerned that all of the comity that you can grant --

23   because you can grant comity, right?  You can adjust the

24   relationship between debtors and creditors almost un -- with

25   unlimited scope under 1507 and 1521.  But sometimes,

1    adjusting the relationship between debtors and creditors

2    creates a problem because the foreign court that's telling

3    you what to do is perpetuating an injustice on creditors,

4    effectively.

5            And so what 1506 says is, even if there is a

6    statutory basis in 1521 or 1507, to adjust the relationship

7    between creditors and debtors, there's a safety valve for

8    you, if you feel like what happened in the foreign court --

9    and you see this, right?  You see this if the insiders in

10   Vitro got the plan across the finish line and creditors

11   really wanted nothing about -- nothing to do with it, or if

12   there was procedural due process that was completely missing

13   in the foreign court.  The relief is still available, it's

14   between a creditor and a debtor, so 1521 gives you exactly

15   what you need to do.  But you have the authority to look

16   through the Court's order at that context and say yeah,

17   public policy is a concern, I'm not going to enforce it.

18   That's what it's for.  Okay.

19           THE COURT:  Okay.

20           MR. BUTTERFIELD:  Thank you, Your Honor.

21           THE COURT:  Okay.  Anything else?

22       (No verbal response)

23           THE COURT:  Okay.  I'm going to take a recess for a

24   few minutes, I'll be back shortly.  Okay?  We're in recess.

25       (Recess taken at 4:11 p.m.)

1          (Proceedings resume at 4:31 p.m.)

2          (Call to order of the Court)

3               THE COURT:  Please be seated.

4               Okay.  I am going to -- well, first of all, the

5     only issue that really is before me here is the issue about

6     whether I can grant recognition to the Concurso order and the

7     Concurso plan.  And there is no dispute that I can recognize

8     the Mexican proceeding as a foreign main proceeding.

9               I am going to grant the motion.  And I greatly

10    appreciated and enjoyed the argument.

11              But I think Purdue only goes so far here.  Purdue

12    is expressly limited to a Chapter 11 case.  Chapter 11 and

13    Chapter 15 are very different animals.

14              And while I appreciate the argument that you made,

15    Mr. Butterfield, on what guidance Purdue can provide, in

16    terms of reading and understanding what Congress meant in

17    1521, you know, ultimately, I look back to a long line of

18    authority that says, essentially, so long as Section 1522 is

19    satisfied -- and I think it's -- undoubtedly, it is satisfied

20    here -- that 1521(a) does provide ample authority for

21    recognition of a foreign plan.

22              And a foreign plan does not have to, in every

23    respect, comport with what Chapter 11 would provide or any

24    other provision of American law, unless it is manifestly

25    contrary to the public policy of the United States, as

1    Congress tells us, under Section 1506.

2           I don't find that this plan implicates the public

3    policy exception.  Non-consensual third-party releases are

4    permitted under Mexican law.  They are not manifestly

5    contrary to American law.  And for that, we can look to

6    Section 524(g) and see where Congress has expressly permitted

7    non-consensual third-party releases in the context of

8    asbestos cases.  And that teaches us, if such a release were

9    manifestly contrary to United States public policy, we

10   wouldn't have 524(g).

11          So I'm quite satisfied that Purdue does not create

12   any impediment to recognition of the Concurso order and the

13   Concurso plan, and that the role of this Court in Chapter 15

14   is, you know, as it says in Section 1501, where it lays out

15   the purpose:  We're cooperating with the Mexican Court and

16   giving effect to its orders.  And principles of comity are

17   key here.  And this Court is simply going to recognize the

18   order.

19          And look, this is an issue that I think is of

20   significant -- sufficient interest that I will write

21   something.  I recognize I'll need to write quickly for the

22   purposes of this dispute.

23       (Laughter)

24          THE COURT:  But I am going to write something that

25   will hopefully spell it out in a more articulate manner than

1    I've just done here.

2            But again, I really appreciate the arguments that

3    I've had on an issue that I think is of significance and --

4    but I am granting the motion.  Okay?

5            MR. CUNNINGHAM:  Thank you, Your Honor.

6            THE COURT:  Okay.  Anything else for today?

7            MS. STEELE:  Your Honor --

8            THE COURT:  Well, we do, we have the two --

9            MS. STEELE:  We have the two --

10           THE COURT:  -- dismissal --

11           MS. STEELE:  -- other --

12           THE COURT:  -- motions.

13           MS. STEELE:  -- matters.

14           Your Honor, we've uploaded the recognition order

15    and we have also uploaded the orders for the withdrawal of

16    the verified petition and then the withdrawal -- or

17    dismissing the involuntary.  We would request that, once the

18    recognition order is entered, the two other follow that.

19           THE COURT:  Great.  We'll do it in that order.

20           MS. STEELE:  Okay.  Great.  Thank you, Your Honor.

21           THE COURT:  Okay.  And anything else?

22           MS. STEELE:  That's it.

23           MR. CUNNINGHAM:  No, Your Honor.

24           THE COURT:  Okay.

25           MR. CUNNINGHAM:  Thank you.

64

1              THE COURT:  Okay.  Thank you all very much.

2          (Proceedings concluded at 4:36 p.m.)

3                        * * * * *

4                      CERTIFICATION

5          I certify that the foregoing is a correct

6      transcript from the electronic sound recording of the

7      proceedings in the above-entitled matter to the best of my

8      knowledge and ability.

9

10

11

12

13      _____          March 12, 2025

14      Coleen Rand, AAERT Cert. No. 341

15      Certified Court Transcriptionist

16      For Reliable

17

18

19

20

21

22

23

24

25