**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.,[1] | Case No. 25-10208 (TMH) |
| Debtor in a foreign proceeding. | |

## OPINION

In its June 27, 2024 decision in <u>Harrington v. Purdue Pharma, L.P.</u>,[2] the Supreme Court held that a chapter 11 plan of reorganization cannot provide for a nonconsensual third-party release of claims against a non-debtor.[3] Following that decision, the international insolvency community has debated whether, under chapter 15, a bankruptcy court nonetheless may enter an order enforcing a *foreign plan* containing such releases.[4] That is the question presented here. At the recognition hearing held in this chapter 15 case on March 11, 2025, in an oral bench

---

[1] The last four identifying digits of the tax number and the jurisdiction in which the Chapter 15 Debtor pays taxes is Mexico – 6815. The Chapter 15 Debtor's corporate headquarters is located at Avenida Insurgentes Sur No. 730, 20th Floor, Colonia del Valle Norte, Alcaldía Benito Juárez, 03103, Mexico City, Mexico.

[2] 603 U.S. 204 (2024).

[3] <u>Id.</u> at 226–27 ("Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

[4] <u>See, e.g.</u>, Joshua Kieran-Glennon, <u>Restructuring Update: Third-Party Releases after Purdue Pharma – Solutions in Irish Law</u>, McCann FitzGerald (Nov. 7, 2024), available at https://perma.cc/HR72-YR79; Michelle McGreal, Douglas Deutsch, & Robert Johnson, <u>Purdue Pharma Bankruptcy Ruling Sidesteps Chapter 15 Implications</u>, Bloomberg (July 10, 2024), available at https://perma.cc/5U5G-CXBF.

ruling, this Court held that such an order is permissible after <u>Purdue</u> and granted enforcement of a Mexican plan containing such releases.

Section 1501 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") describes the "purpose and scope of application" of chapter 15.[5] When it enacted chapter 15, Congress sought to facilitate cooperation between the courts of the United States and the courts of foreign countries in cross-border insolvency cases and to empower a court exercising bankruptcy jurisdiction to render assistance to the foreign court.[6]

In this case, Robert Wagstaff, the foreign representative (the "<u>Foreign Representative</u>") of Crédito Real, S.A.B. de C.V., SOFOM, E.N.R. (the "<u>Chapter 15 Debtor</u>"), petitioned for entry of an order recognizing the Chapter 15 Debtor's Mexican bankruptcy case (the "<u>Mexican Prepack Proceeding</u>") as a foreign main proceeding.[7] That request was unopposed.

The Foreign Representative also asked this Court to render assistance to the Mexican court by recognizing and enforcing the plan that the Mexican court

---

[5] 11 U.S.C. § 1501.

[6] <u>Id.</u>; <u>see also</u> <u>In re ABC Learning Ctrs. Ltd.</u>, 728 F.3d 301, 304–05 (3d Cir. 2013) (examining Congress's purpose in enacting chapter 15 and explaining the objectives of the legislation); <u>In re Irish Bank Resol. Corp.</u>, No. 13-12159 (CSS), 2014 WL 9953792, at *9–10 (Bankr. D. Del. Apr. 30, 2014), <u>aff'd</u>, 538 B.R. 692 (D. Del. 2015).

[7] Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521 (the "<u>Verified Petition</u>") [D.I. 2].

approved. The parties refer to that plan as the Concurso Plan[8] and the order approving it as the Concurso Order.[9]

The United States International Development Finance Corporation (the "DFC") opposed this relief, arguing that the nonconsensual third-party releases contained in the Concurso Plan are not authorized under chapter 15 and would be "manifestly contrary to the public policy of the United States."[10] This Court overruled that objection and entered its Order Granting (I) Recognition of Foreign Main Proceeding, (II) Full Force and Effect to Concurso Plan and Certain Related Relief (the "Recognition Order").[11] On March 25, 2024, the DFC filed its notice of appeal.[12] This is the Court's written opinion in support of the Recognition Order.[13]

---

[8] Foreign Rep. Ex 7.

[9] Foreign Rep. Ex. 8.

[10] 11 U.S.C. § 1506.

[11] D.I. 51.

[12] D.I. 58.

[13] See Del. Bankr. L.R. 8003-2 ("Any bankruptcy Judge whose order is the subject of an appeal may file a written opinion that supports the order being appealed or that supplements any earlier written opinion or recorded oral bench ruling or opinion within 7 days after the filing date of the notice of appeal.").

I.    Background[14]

The Chapter 15 Debtor was one of Mexico's largest non-bank financial lending institutions.[15] Its customers were located predominantly in Mexico, elsewhere in Latin America, and in the United States.[16] It is a Mexican company, and it held or holds direct or indirect equity interests in entities located in Mexico, the United States, Honduras, Panama, Turks and Caicos, Costa Rica, Nicaragua, Guatemala, and El Salvador.[17]

In 2021, amid a liquidity crisis, the Chapter 15 Debtor began discussions with its key creditors on a restructuring.[18] These negotiations failed, and in June 2022, an ad hoc group of unsecured creditors (the "Ad Hoc Group") filed an

---

[14] This background section is based on the (i) Verified Petition;, (ii) the Declaration of Juan Pablo Estrada Michel Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521 (the "Estrada Dec.") [D.I. 3] (Foreign Rep. Ex. 2); and (iii) the Supplemental Declaration of Juan Pablo Estrada Michel Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant to 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521 (the "Estrada Supp. Dec.") [D.I. 41] (Foreign Rep. Ex. 11). The Verified Petition, Estrada Dec., and Estrada Supp. Dec. were admitted without objection. Messrs. Wagstaff and Estrada were not cross-examined.
[15] Verified Petition ¶ 1.
[16] Id.
[17] Id. ¶ 4.
[18] Id. ¶ 11.

involuntary chapter 11 petition against the Chapter 15 Debtor (the "Involuntary Chapter 11 Case").[19]

On June 28, 2022, one of the Chapter 15 Debtor's shareholders commenced a liquidation proceeding in the 52nd Civil State Court of Mexico City, Mexico (the "Mexican Liquidation Proceeding").[20] The court appointed Fernando Alonso-de-Florida Rivero as judicial liquidator (the "Mexican Liquidator").[21]

Then, on July 14, 2022, the Foreign Representative filed a petition under chapter 15 in this Court (the "Prior Chapter 15 Case"), along with a petition for recognition of the Mexican Liquidation Proceeding as a foreign main proceeding.[22]

Following these events, the Chapter 15 Debtor, the Mexican Liquidator, the Foreign Representative, and the Ad Hoc Group adjourned pending disputed matters in the Involuntary Chapter 11 Case and the Prior Chapter 15 Case to pursue settlement discussions.[23] These negotiations succeeded, and the Chapter 15 Debtor, the Mexican Liquidator, and the Ad Hoc Group entered into a restructuring support agreement (the "RSA") to implement a global restructuring of the Chapter 15 Debtor's assets and liabilities.[24] It was under the terms of the RSA that the Mexican

---

[19] Id. ¶ 12; In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R., Case No. 22-10696 (TMH) (formerly Case No. 22-10842 (DSJ) in the United States Bankruptcy Court for the Southern District of New York).
[20] Id. ¶ 13.
[21] Estrada Dec. ¶ 48.
[22] Verified Petition ¶ 14; In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R., Case No. 22-10630 (TMH).
[23] Verified Petition ¶ 15.
[24] Id. ¶ 20; Foreign Rep. Ex. 9.

Liquidator commenced the Mexican Prepack Proceeding.[25] The parties agreed that that Foreign Representative would seek recognition here of the Mexican Prepack Proceeding as a foreign main proceeding and an order giving full force and effect to the Concurso Plan.[26]

On October 6, 2023, the Chapter 15 Debtor commenced the Mexican Prepack Proceeding at the direction of the Mexican Liquidator by filing a voluntary petition with the Mexican court.[27] On November 13, 2023, the Mexican Court issued a judgment officially commencing the conciliation stage of the Mexican Prepack Proceeding (the "Concurso Judgment").[28]

The Concurso Judgment imposed protective measures designed to preserve the Chapter 15 Debtor's estate, including a stay on all enforcement and collection actions against the Chapter 15 Debtor's assets and a prohibition on paying obligations due before the date of the commencement of the Mexican Prepack Proceeding.[29] Miguel Escamilla Villa was appointed as the Conciliator[30] of the Mexican Prepack Proceeding.[31] The Concurso Judgment was served on creditors and other parties through publication in a nationwide newspaper and in the Official Journal of the Federation; additionally, a summary of the judgement was registered

---

[25] Verified Petition ¶ 20.
[26] Id.
[27] Id. ¶ 21; Foreign Rep. Ex. 4.
[28] Foreign. Rep. Ex. 5.
[29] Estrada Dec. ¶ 55.
[30] Under Mexican bankruptcy law, the court appoints the Conciliator to work with the debtor and its recognized creditors on an agreement about the debtor's restructuring. See id. ¶ 29 for a description of the role of the Conciliator.
[31] Id. ¶ 56.

in the Public Registry of Commerce to ensure that all interested parties, including foreign creditors, were adequately informed.[32]

On March 20, 2024, the Mexican Court issued a judgment of recognition that confirmed the ranking and classification of all the creditors' claims (the "Recognition Judgment").[33]

On May 21, 2024, the Concurso Plan was presented to the creditors recognized under the Recognition Judgment, and on July 1, 2024, with the consent of the majority of the recognized creditors, the Conciliator formally submitted the plan to the Mexican Court.[34] On August 15, 2024, the Mexican Court issued the Concurso Order overruling all objections to the Concurso Plan and finding that the Concurso Plan satisfied all of the requirements of the Mexican Bankruptcy Law and did not violate Mexican public policy.[35] The Concurso Plan received support representing 56.55% of the aggregate outstanding unsecured claims.[36]

The Concurso Plan is consistent with the terms of the RSA and provides for the repayment of creditors who are located in the United States.[37] It establishes the creation of a special purpose vehicle through a Mexican trust, to which almost all of

---

[32] Id. ¶ 57.
[33] Id. ¶ 58; Foreign Rep. Ex. 6.
[34] Estrada Dec. ¶ 60.
[35] Id. ¶ 61; see also Ley de Concursos Mercantiles [LCM] (Bankruptcy Law) art. 64, Diario Oficial de la Federación [DOF] 12-5-2000, últimas reformas DOF 14-1-2014 (Mex.) (establishing the requirements for a plan to obtain approval under Mexican Bankruptcy Law).
[36] Estrada Dec. ¶ 62.
[37] Id. ¶ 63.

the Chapter 15 Debtor's remaining assets will be transferred.[38] Upon the

monetization, sale, or assignment of such assets, the corresponding proceeds will be

distributed according to the priority scheme set forth in the Mexican Bankruptcy

Law, *pari passu* and *pro rata* among unsecured creditors.[39]  Upon the distribution,

the unsecured claims will be cancelled or extinguished in accordance with the

Concurso Plan.[40]

Clause 16 of the Concurso Plan contains exculpatory provisions that shield

certain parties who played roles in the negotiation and implementation of the

Chapter 15 Debtor's restructuring process, including the Ad Hoc Group, the

Mexican Liquidator, the Chapter 15 Debtor's former directors and officers, the

Indenture Trustee, and certain related parties (the "<u>Release</u>").[41] These parties are

exculpated for any actions or inactions taken during the restructuring process prior

to the creditors' formal acceptance of the plan, subject to the Concurso Plan's carve-

outs and exceptions.[42] Specifically, the Concurso Plan provides:

> In any event, [the Chapter 15 Debtor] and the Recognized Creditors
> agree not to bring any action, complaint, suit or claim, as the case may
> be, against the Participating Recognized Creditors nor [the Chapter 15
> Debtor], respectively, as well as their shareholders, its former general
> manager Felipe Guelfi Regules, liquidator, directors, officers,
> secretaries, depositaries and officers, and The Bank of New Mellon, as
> trustee for [the Chapter 15 Debtor]'s foreign-denominated bonds
> denominated in U.S. dollars, legal tender in the United States of
> America, and euros, legal tender in the European Union as the case may
> be, for any act or omission incurred by them during the Bankruptcy

---

[38] <u>Id.</u>

[39] <u>Id.</u>

[40] <u>Id.</u>

[41] <u>Id.</u> ¶ 66; Concurso Plan, Clause 16.

[42] Concurso Plan, Clause 16.

Proceeding and at any time prior to the execution of this Agreement, except for actions, complaints, claims or demands, as the case may be, for acts or omissions of [the Chapter 15 Debtor] that have caused damage or impairment to the Bankruptcy Estate and that they have failed to declare or disclose to the Participating Recognized Creditors during the negotiations of this Settlement Agreement and up to the date of its execution.[43]

As written, the Release is customary in Mexican settlement agreements and is permitted under Mexican Bankruptcy Law.[44] Under the Concurso Order, the Mexican Court determined that the Concurso Plan and the Release are consistent with Mexican Bankruptcy Law and not in violation of the public or individual interest of any specific creditor.[45] The Concurso Order has not been subject to a stay in Mexico, so it remains in effect and is enforceable under Mexican law.[46]

The DFC was an active participant in the Mexican Prepack Proceeding.[47] It filed a proof of claim and objected to the approval of the Concurso Plan on grounds that were unrelated to the Release.[48] On November 21, 2024, the DFC appealed the Concurso Order, challenging, among other things, the Release.[49] On December 10, 2024, the Ad Hoc Group, the Chapter 15 Debtor, and the Conciliator each filed a reply to the DFC's appeal.[50] In their respective briefs, the Chapter 15 Debtor and Ad Hoc Group argued that the Release does not violate Mexican Bankruptcy Law,

---

[43] Concurso Plan Clause 16.
[44] See Estrada Supp. Dec. ¶ 17.
[45] Id. ¶ 25.
[46] Id.
[47] Id. ¶ 22.
[48] Id. ¶¶ 23–24.
[49] Id. ¶ 26.
[50] Id. ¶ 27.

and they defended the propriety of the Release.[51] The DFC appeal remains

pending.[52]

On February 7, 2025, the Foreign Representative filed the Verified Petition,

commencing this chapter 15 case and seeking entry of an order recognizing the

Mexican Prepack Proceeding and enforcing the Concurso Plan and Concurso Order.

The DFC objected.[53]

On March 11, 2025, this Court conducted an evidentiary hearing to consider

the Verified Petition and concluded that it possessed the power to grant (i)

recognition to the Mexican Prepack Proceeding as a foreign main proceeding, and

(ii) comity and full force and effect to the Concurso Plan. The Court accordingly

entered the Recognition Order.[54]

II.    The DFC Objection

In the DFC Objection, the DFC argued that the Concurso Plan cannot be

recognized in its current form because the Release is not authorized under

Bankruptcy Code sections 1507 and 1521.

It contends that Bankruptcy Code section 1521(a) does not include third-

party releases as relief available to a foreign debtor. Specifically, the DFC argues

---

[51] Id.

[52] Id. ¶ 23.

[53] See Objection of United States International Development Finance Corporation to Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Full Force and Effect to the Concurso Plan and Related Relief Pursuant To 11 U.S.C. §§ 105, 1507(a), 1509(b), 1515, 1517, 1520 and 1521 (the "DFC Objection") [D.I. 30].

[54] Following entry of the Recognition Order, this Court entered orders dismissing the Involuntary Chapter 11 Case and the Prior Chapter 15 Case.

that the term "any appropriate relief" used in that section refers to relief available under the Bankruptcy Code. The DFC contends that non-consensual third-party releases are not available. Relatedly, it contends that Bankruptcy Code section 1507, which provides that a U.S. court may grant "additional assistance" to a foreign representative, also does not provide for such relief.

The DFC posits that the Foreign Representative wrongly relies on the catchall provisions of Bankruptcy Code section 1521(a)(7) and 1507 to justify enforcement of the Concurso Plan. In so doing, it points to Purdue. However, the DFC does not argue that Purdue's refusal to approve a non-consensual third-party release in that chapter 11 case means that such a release cannot be available in chapter 15. Instead, the DFC argues that Purdue offers a framework for thinking about statutory interpretation that means this Court lacks authority to order enforcement of the Release.

The DFC contends that this Court should read the catchall provisions of Bankruptcy Code sections 1521(a)(7) and 1507 in the same way the Purdue Court read Bankruptcy Code section 1123(b)(6), and therefore conclude that catchall provisions like these are limiting provisions that provide no authority for enforcement of the Release.

The DFC also argues that the Release is "manifestly contrary to the public policy of the United States" as provided in Bankruptcy Code section 1506.

III.    Discussion

This is a core proceeding under 28 U.S.C. § 157(b)(2)(P) because it involves

"matters under chapter 15 of title 11." The DFC did not contest that recognition of

the Mexican Prepack Proceeding under Bankruptcy Code section 1517 was

appropriate, and this Court entered an order granting recognition of the Mexican

Prepack Proceeding as a foreign main proceeding. As a consequence of that

recognition, this Court "shall grant comity or cooperation to the [F]oreign

[R]epresentative."[55]

Chapter 15 begins with a policy statement. Section 1501, which is titled

"Purpose and scope of application," provides:

> (a) The purpose of this chapter is to incorporate the Model Law on Cross-
> Border Insolvency so as to provide effective mechanisms for dealing with
> cases of cross-border insolvency with the objectives of—
>
> (1) cooperation between—
>
> (A) courts of the United States, United States trustees, trustees,
> examiners, debtors, and debtors in possession; and
>
> (B) the courts and other competent authorities of foreign
> countries involved in cross-border insolvency cases;
>
> (2) greater legal certainty for trade and investment;
>
> (3) fair and efficient administration of cross-border insolvencies that
> protects the interests of all creditors, and other interested entities,
> including the debtor;
>
> (4) protection and maximization of the value of the debtor's assets;
> and

---

[55] 11 U.S.C. § 1509(b)(3) (directing a court to grant comity if it has granted
recognition under section 1517 and subject to any limitations consistent with the
policy of chapter 15).

12

(5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.[56]

No other chapter of the Bankruptcy Code sets forth a similar statement about its purpose. The inclusion of this policy statement in section 1501 highlights that the Court should be guided by the main policy goals of chapter 15—cooperation and comity with foreign courts and deference to those courts within the confines established by chapter 15.

The importance of comity is reinforced in section 1507(b), which instructs that the provision of "additional relief" be "consistent with the principles of comity . . . ."[57] It is then further emphasized in section 1509(b)(3), which provides that when a U.S. court grants recognition of a foreign proceeding under Bankruptcy Code

---

[56] 11 U.S.C. § 1501(a). The language of this section closely tracks the Preamble of the UNCITRAL Model Law of Cross-Border Insolvency, which provides that:

> The purpose of this Law is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of:
>
> (a) Cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency;
>
> (b) Greater legal certainty for trade and investment;
>
> (c) Fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;
>
> (d) Protection and maximization of the value of the debtor's assets; and
>
> (e) Facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

[57] 11 U.S.C. § 1507(b).

section 1517, it "shall grant comity or cooperation to the foreign representative."[58]

Therefore, in deciding the issues presented here, this Court is mindful of the context

in which it operates and considers the centrality of cooperation and comity in

reaching its decision.

Upon recognition of a foreign main proceeding, the Court has broad discretion

to order enforcement of orders entered in a foreign main proceeding, consistent with

the guiding principles of comity.[59] These principles of comity are particularly

compelling in the bankruptcy context, where "American courts have long recognized

the need to extend comity to foreign bankruptcy proceedings, because the equitable

and orderly distribution of a debtor's property requires assembling all claims

against the limited assets in a single proceeding; if all creditors could not be bound,

a plan of reorganization would fail."[60] Therefore, when considering whether to

---

[58] 11 U.S.C. § 1509(b)(3).

[59] See In re Energy Coal S.P.A., 582 B.R. 619, 626–27 (Bankr. D. Del. 2018) (quoting In re Daebo Int'l Shipping Co., 543 B.R. 47, 52–53 (Bankr. S.D.N.Y. 2015)) (explaining that the Bankruptcy Code gives courts "broad discretion" and instructs them to be "guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief"); In re Grant Forest Prods., Inc., 440 B.R. 616, 621 (Bankr. D. Del. 2010) (stating that this broad power is designed to promote cooperation between U.S. courts and foreign courts in cross-border insolvency cases); In re Elpida Memory, Inc., No. 12-10947 CSS, 2012 WL 6090194, at *7–8 (Bankr. D. Del. Nov. 20, 2012) (reiterating the broad discretion certain sections of chapter 15 accord, consistent with principles of comity). See generally Hilton v. Guyot, 159 U.S. 113, 164 (1895) (defining comity as the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protections of its laws").

[60] In re Energy Coal S.P.A., 582 B.R. at 627 (quoting In re Atlas Shipping A/S, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009)) (internal quotation marks and alterations omitted). See generally In re ABC Learning Ctrs. Ltd., 728 F.3d at 304–07

14

enforce an order entered in a foreign main proceeding, U.S. bankruptcy courts should aim to maximize assistance to the foreign court conducting the foreign main proceeding.[61]

Two provisions through which a U.S. bankruptcy court may enforce orders entered in a foreign main proceeding are Bankruptcy Code sections 1521(a) and 1507. The Foreign Representative asked that this Court enforce the Concurso Plan under those sections. Section 1521(a) empowers bankruptcy courts to grant appropriate relief, whereas section 1507 empowers bankruptcy courts to provide additional assistance.

However, Bankruptcy Code section 1521(a)'s and 1507's broad grants of discretion are limited in multiple ways. A main limitation on the court's discretion under these sections is Bankruptcy Code section 1506. That section provides that the court may "refus[e] to take an action governed by [chapter 15] if the action would be manifestly contrary to the public policy of the United States."[62] Refusing to take an action under Bankruptcy Code section 1506 is an extraordinary act. That section should be "narrowly interpreted, as the word 'manifestly' in international

---

(discussing the origins of chapter 15 and emphasizing the role of comity in bankruptcy proceedings).

[61] See In re ABC Learning Ctrs. Ltd., 728 F.3d at 306 (explaining that chapter 15 directs U.S. courts to act "in aid of the main proceedings, in preference to a system of full bankruptcies . . . in each state where assets are found" (quoting H.R. Rep. No. 109–31(1), at 109 (2005) reprinted in 2005 U.S.C.C.A.N. 88, 171)).

[62] 11 U.S.C. § 1506.

usage restricts the public policy exception to the most fundamental policies of the

United States."[63] As a consequence, that authority rarely is exercised.[64]

Under Bankruptcy Code section 1506, the Court's discretion to enforce orders

of a foreign court is circumscribed by fundamental policies of fairness. Since before

the enactment of chapter 15, for a U.S. bankruptcy court to enforce an order of a

foreign court in an insolvency proceeding, courts have required that the foreign

proceeding afford litigants the same fundamental protections that they would have

received in a U.S. court.[65] Relief that is granted in a foreign proceeding does not

---

[63] In re Ephedra Prods. Liab. Litig., 349 B.R. 336 (S.D.N.Y. 2006) (citing H.R. Rep. No. 109–31(I) at 109, reprinted in 2005 U.S.C.C.A.N. 88, 172).

[64] See In re PT Bakrie Telecom Tbk, 628 B.R. 859, 890–91 (Bankr. S.D.N.Y. 2021) (reading the public policy exception narrowly because the word "manifestly" restricts it to the "most fundamental" U.S. policies and finding that, prior to Purdue, non-consensual third-party releases were not manifestly contrary to U.S. public policy); In re Sino-Forest Corp., 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (emphasizing that courts should construe this section narrowly and finding that, prior to Purdue, non-consensual third-party releases were not manifestly contrary to U.S. public policy); In re Metcalfe & Mansfield Alternative Invs., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (construing the section narrowly and finding that, prior to Purdue, U.S. bankruptcy courts could enforce non-consensual third-party releases because they were not manifestly contrary to U.S. public policy). Compare In re Rede Energia S.A., 515 B.R. 69, 98 (Bankr. S.D.N.Y. 2014) (stating that section 1506 should be construed narrowly and used sparingly and finding that to enact the Brazilian plan would not be manifestly contrary to the public policies of the United States because "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence"), with In re Toft, 453 B.R. 186, 198 (Bankr. S.D.N.Y. 2011) (finding that while a difference in U.S. law from the foreign law does not necessarily preclude enforcement under chapter 15, the plan component at issue was affirmatively banned under U.S. law, enforcement would subject the enforcer to criminal liability, and enforcement would directly compromise privacy rights established in a comprehensive statutory scheme and based on constitutional rights).

[65] Courts are divided on the statutory source of this limitation, but they agree that it is a central tenet of whether to afford foreign orders comity in insolvency proceedings, and it has remained so throughout multiple iterations of the

have to be identical to relief that might be available in a U.S. proceeding.[66] Instead,

the cases teach that we should look to the fairness of the foreign proceeding.[67]

---

Bankruptcy Code and the U.S. bankruptcy system itself. See Vertiv, Inc. v. Wayne Burt PTE, Ltd., 92 F.4th 169, 180 (3d Cir. 2024) (holding that a court should examine the foreign proceeding's fairness pursuant to principles of comity); In re Irish Bank Resol. Corp., 2014 WL 9953792 at *18 (explaining that a court must examine the procedural fairness of the foreign proceedings pursuant to the public policy exception of section 1506); In re PT Bakrie Telecom Tbk, 628 B.R. at 884 (clarifying that the considerations of fairness a court must examine in its determination of whether to enforce an order of a foreign court overlap with the considerations of Bankruptcy Code sections 1521 and 1507, all combining to "assure the just treatment and protection against prejudice of claim holders in the United States through adequate procedural protections"); In re Rede Energia S.A., 515 B.R. at 90 (holding that Bankruptcy Code section 1507 establishes the fairness considerations that courts must examine in determining whether to grant comity to a foreign court's order); In re Sino-Forest Corp., 501 B.R. at 662–63 (emphasizing the importance of ensuring fairness in the foreign proceeding when determining whether to grant a foreign order comity under chapter 15); In re Atlas Shipping A/S, 404 B.R. at 733 (explaining that before Congress enacted chapter 15, Bankruptcy Code section 304 required bankruptcy courts, when considering whether to enforce foreign orders, to determine that such enforcement would not prejudice the rights of U.S. citizens); Phila. Gear Corp. v. Phila. Gear de Mex., S.A., 44 F.3d 187, 193–94 (3d Cir. 1994) (directing the District Court, in determining whether to grant comity to a Mexican proceeding, to make findings on certain considerations of fairness, including whether the Mexican court was a duly authorized tribunal, whether the plan provided for equal treatment of creditors, whether recognition would be inimical to the U.S. policy of equality, and whether the U.S. creditor would be prejudiced); Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 536 (1883) (considering whether to afford comity to a Canadian insolvency plan and determining that the Canadian proceedings did not deprive creditors of their property without due process of law).

[66] In re Metcalfe, 421 B.R. at 697 (explaining that enforcement of relief in a foreign plan does not require identical relief to be available in the United States); In re Toft, 453 B.R. at 198 (emphasizing that the mere fact that U.S. law differs from the law of the foreign main proceeding does not preclude enforcement as "manifestly contrary" to U.S. public policy).

[67] See In re Elpida Memory, Inc., 2012 WL 6090194, at *7–8 (explaining that comity is limited to instances where U.S. parties are provided the same fundamental protections that litigants in the United States would receive and finding that Bankruptcy Code section 1520(a) requires U.S. Bankruptcy Courts to apply the standard for a sale of assets under Bankruptcy Code section 363 to comport with

Therefore, as a matter of comity, if the forum of the foreign proceeding offers "a full

and fair trial abroad before a court of competent jurisdiction, conducting the trial

upon regular proceedings, after due citation or voluntary appearance of the

defendant, and under a system of jurisprudence likely to secure an impartial

administration of justice between the citizens of its own country and those of other

countries, and there is nothing to show either prejudice in the court, or in the

system of laws under which it is sitting," the judgment should be enforced.[68]

---

this limitation); In re Agrokor d.d., 591 B.R. 163, 184 (Bankr. S.D.N.Y. 2018) (construing section 1506 to allow deference to the foreign court so long as the foreign proceedings are procedurally fair and not manifestly contrary to U.S. public policy); In re Atlas Shipping A/S, 404 B.R. at 733 ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy.").
[68] Hilton v. Guyot, 159 U.S. 113, 202–03 (1895); accord In re Metcalfe, 421 B.R. at 698; see also In re Elpida Memory, Inc., 2012 WL 6090194, at *7 (requiring, for enforcement of the foreign plan, that the foreign proceeding afford the litigants the same fundamental protections that they would receive in the United States); In re PT Bakrie Telecom Tbk, 628 B.R. at 878–79 (looking to Hilton and other cases for factors of fairness in determining whether to grant comity). In examining the procedural fairness of a foreign main proceeding, courts have also looked at:

> (1) whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the right to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to the debtors' potential claimants; (5) whether there are provisions for creditors' meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

Vertiv, Inc. v. Wayne Burt PTE, Ltd., 92 F.4th at 181 (internal alterations omitted); accord In re PT Bakrie Telecom Tbk, 628 B.R. at 879 (quoting Allstate Life Ins. v. Linter Grp., 994 F.2d 996, 999 (2d Cir. 1993)); In re Sino-Forest Corp., 501 B.R. at

A. <u>Statutory Interpretation of Bankruptcy Code Sections 1521(a) and 1507</u>

The DFC argues that the Supreme Court's analysis of Bankruptcy Code section 1123(b) in <u>Purdue</u> changes the way courts should interpret sections 1521(a) and 1507. It does not.

This section begins by recounting the DFC's argument in further detail. Next, it examines the plain meaning of the language in Bankruptcy Code sections 1521(a) and 1507. Then, it analyzes congressional intent through canons of statutory construction to confirm the plain meaning interpretation. As it proceeds through the plain language analysis and then the canons of construction analysis, it also compares the conclusions derived from sections 1521(a) and 1507 to section 1123(b)(6) and the conclusions the Supreme Court derived from that section. Because the power to enforce the Concurso Plan and the Concurso Order may only derive from Bankruptcy Code sections 1521(a)(7) or 1507(a) (the "<u>Chapter 15 Catchalls</u>"), the focus of this analysis is on those subsections.

The DFC specifically argues that the Chapter 15 Catchalls are analogous to the catchall provision of Bankruptcy Code section 1123(b)(6), so the Court should interpret them all the same way.[69] Section 1123(b) enumerates certain relief that a chapter 11 plan may provide. Subsection (6)—or, as the Supreme Court refers to it in <u>Purdue</u>, the "catchall"—provides that a chapter 11 plan may "include any other

---

662–63 (quoting <u>Finanz AG Zurich v. Banco Economico S.A.</u>, 192 F.3d 240, 249 (2d Cir. 1999)).
[69] DFC Objection at 4.

appropriate provision not inconsistent with the applicable provisions of this title."[70]
The <u>Purdue</u> Court held that subsection (6) does not allow a chapter 11 plan to
include nonconsensual third-party releases when interpreted in light of its
surrounding context pursuant to the statutory canon of *ejusdem generis*.[71] It
explained that the other provisions in section 1123(b) authorized relief that
concerns the debtor, its rights and responsibilities, and its relationship with its
creditors.[72] Because none of the other provisions in section 1123(b) consider a third-
party's relationship with a creditor, the Supreme Court explained, subsection (6)
must be interpreted in that context and should not extend to govern a third-party's
relationship with a creditor by granting nonconsensual third-party releases.[73]

The DFC urges this Court to apply a similar analysis to sections 1521(a)(7)
and 1507(a). It asserts that because those subsections are catchalls, like section
1123(b)(6), and because neither section 1521(a) nor 1507 discusses third-party
relationships, then the Chapter 15 Catchalls should not extend to allow
nonconsensual third-party releases. Neither the plain language nor canons of
statutory interpretation support the DFC's arguments.

In determining how to interpret sections 1521(a) and 1507, "[o]ur
interpretation . . . starts 'where all such inquiries must begin: with the language of

---

[70] 11 U.S.C. 1123(b)(6).
[71] <u>Purdue</u>, 603 U.S. at 217–18.
[72] <u>Id.</u> at 218.
[73] <u>Id.</u>

the statute itself.'"[74] If the text of the statute is unambiguous, we construe it

according to its plain meaning.[75] If it is ambiguous, then we turn to legislative

history and the canons of construction to determine congressional intent in enacting

the statute.[76] However, "[i]n any event, canons of construction are no more than

rules of thumb that help courts determine the meaning of legislation[.]"[77]

Section 1521, subsection (a) provides:

Upon recognition of a foreign proceeding, whether main or nonmain,
where necessary to effectuate the purpose of this chapter and to protect
the assets of the debtor or the interests of the creditors, the court may,
at the request of the foreign representative, grant any appropriate relief,
including—

(1) staying the commencement or continuation of an individual
action or proceeding concerning the debtor's assets, rights,

---

[74] Ransom v. FIA Card Services, N.A., 562 U.S. 61, 69 (2011) (quoting United States
v. Ron Pair Enters., 489 U.S. 235, 241 (1989)); see also In re Phila. Newspapers,
LLC, 599 F.3d 298, 304 (3d Cir. 2010), as amended (May 7, 2010) ("It is the cardinal
canon of statutory interpretation that a court must begin with the statutory
language.").

[75] See Jensen v. Pressler & Pressler, 791 F.3d 413, 418 (3d Cir. 2015) ("Our
interpretive task begins and ends with the text of the statute unless the text is
ambiguous or does not reveal congressional intent with sufficient precision to
resolve our inquiry." (internal quotations omitted)); Conn. Nat'l Bank v. Germain,
503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a
statute what it means and means in a statute what it says there."); In re Smale, 390
B.R. 111, 113 (Bankr. D. Del. 2008) ("[T]he starting point is to examine the plain
meaning of the text of the statute. . . . '[W]hen a statute's language is plain, the sole
function of the courts, at least where the disposition by the text is not absurd, is to
enforce it according to its terms.'" (quoting Hartford Underwriters Ins. v. Union
Planters Bank, N.A., 530 U.S. 1, 6 (2000))).

[76] See In re WW Warehouse, Inc., 313 B.R. 588, 591 (Bankr. D. Del. 2004) ("If, after
a studied examination of the statutory context, the natural reading of a provision
remains elusive, the statute is ambiguous and the Court must seek guidance beyond
the statutory text." (internal quotations omitted)); In re Smale, 390 B.R. at 114
("[A]pplying the plain meaning of the statute is the default entrance—not the
mandatory exit.").

[77] Conn. Nat'l Bank v. Germain, 503 U.S. at 253.

obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).[78]

Meanwhile, section 1507 provides:

(a) Subject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.

(b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

(1) just treatment of all holders of claims against or interests in the debtor's property;

---

[78] 11 U.S.C. § 1521(a).

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.[79]

The plain language of the two sections demonstrates that the DFC's interpretation is incorrect for multiple reasons. Beginning with section 1521, subsection (a) enumerates some relief that a bankruptcy court may grant at the request of a foreign representative. However, the section begins by explaining the court may grant "any" appropriate relief. Even though that statement is followed by a list of some relief a court may grant, the word "including" indicates that the enumerated relief is not a complete and exclusive list. Congress expressly addresses the term "including" at Bankruptcy Code section 102(3), providing that the word "'includes' and 'including' are not limiting."[80] This definition codifies the rule of statutory construction that the terms "includes" and "including" are illustrative, and not exclusive or limiting.[81]

---

[79] 11 U.S.C. § 1507.

[80] 11 U.S.C. § 102(3).

[81] See, e.g., Am. Sur. Co. v. Marotta, 287 U.S. 513, 517 (1933) (overruling lower court that found the word "includes" in section 1(9) of the Bankruptcy Act of 1898 to be one of limitation); Friedman v. P+P, LLC (In re Friedman), 466 B.R. 471, 482, n.20 (B.A.P. 9th Cir. 2012) (explaining and providing sources to support the proposition that "including" is not a word of limitation).

It is true that when comparing this "any . . . including" language to that in section 1123(b), they are, at first blush, similar. Section 1521(a) allows a bankruptcy court to "grant any appropriate relief, including . . . any additional relief" while section 1123(b) allows a plan to "include any other appropriate provision." But the critical difference lies in the language that qualifies "any . . . including" in each section.

Section 1521(a) qualifies that language by explaining that any additional relief a court grants should be of the kind that is available to a trustee,[82] and then lists relief that a court should not grant. It is well-settled that enforcement of a third-party release contained in a foreign plan is appropriate under that section.[83]

Meanwhile, section 1123(b) simply states that a court may include any "other" chapter 11 plan provision that is not "inconsistent with the applicable provisions of this title." In <u>Purdue</u>, the Supreme Court explained that the word "other" directs courts to look to the other provisions in section 1123(b) to determine what further relief a court could grant.[84] By looking at section 1123(b)(1)–(5), the Supreme Court thus concludes that subsection (6) should only grant similar relief, as in relief that concerns the debtor and its rights, responsibilities, and

---

[82] The term "trustee" is defined in chapter 15 as "includ[ing] a trustee [and] a debtor in possession in a case under any chapter of this title . . . ." 11 U.S.C. § 1502(6).
[83] <u>See, e.g., In re Arctic Glacier Int'l, Inc., 901 F.3d 162 (3d Cir. 2018)</u> (enforcing third party releases in a Canadian plan of arrangement); <u>In re Avanti Commc'ns Grp. PLC</u>, 582 B.R. at 618 (finding that it had the power to enforce third-party releases under either section 1521(a)(7) or section 1507(a)).
[84] <u>Purdue</u>, 603 U.S. at 218.

relationships.[85] However, section 1521(a) does not direct courts to look to the "other" provisions when providing relief under its catchall.[86] Instead, section 1521(a) allows courts to grant "any additional relief that may be available to a trustee."[87] Accordingly, section 1521(a) does not direct courts to limit its relief to the kind afforded in other provisions, but rather, to relief available to a trustee. Because the relief in question would be available to a trustee, it is permissible under section 1521(a)(7).

Second, section 1521(a)(7) qualifies its "any . . . including" language by listing specific relief that a court is not permitted to grant under that section.[88] That list of prohibited relief does not include nonconsensual third-party releases.[89] By establishing explicit boundaries, Congress allowed relief that does not exceed those boundaries.

On the other hand, in section 1123(b), rather than provide specific prohibited relief, Congress directs courts to look to the whole of the Bankruptcy Code to determine if the requested provision is consistent with it. In Purdue, the Supreme Court framed this section as one that "set[s] out a detailed list of powers, followed by a catchall."[90] It explained, "Congress could have said in [section 1123(b)](6) that 'everything not expressly prohibited is permitted[]'" but instead limited it to "any

---

[85] Id. at 218–19.
[86] 11 U.S.C. § 1521(a)(7).
[87] Id.
[88] 11 U.S.C. § 1521(a)(7) ("except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)").
[89] Id.
[90] Purdue, 603 U.S. at 218.

other appropriate provision not inconsistent with the applicable provisions of this title."[91] In comparison, in section 1521(a)(7), Congress did expressly enumerate what it wanted to prohibit; in a chapter 15 case, a court cannot grant relief under sections 522, 544, 545, 547, 548, 550, and 724(a). By specifically enumerating relief that the court cannot grant under section 1521, Congress more concretely defined the outer bounds of what the court can grant, thus also more concretely defining what is included in what the court can grant, bearing in mind the guiding principles of comity and cooperation.

Briefly turning to a canon of statutory construction before moving onto examining the plain language of section 1507, the canon of *expressio unius* confirms this reading of the express prohibitions established in section 1521(a)(7). "*Expressio unius est exclusio alterius*" stands for the proposition that the expression of one thing means the exclusion of another.[92] By establishing a list of relief that courts should not grant under section 1521(a)(7), the section implies that other forms of relief not expressly prohibited are permitted. Therefore, enforcing foreign orders providing for nonconsensual third-party releases is within the scope of authority that section 1521(a) provides.

Section 1507 similarly affords courts a broad grant of authority to provide relief while setting out express limitations. Section 1507 establishes that a court may provide "additional assistance to a foreign representative" if the court has

---

[91] Id.; 11 U.S.C. § 1123(b)(6).
[92] In re Thompson, 217 B.R. 375, 378 n.5 (B.A.P. 2d Cir. 1998).

recognized the proceeding. Notwithstanding that the term "additional assistance" is a broad term at the outset, it also suggests that even if a court cannot grant relief under section 1521(a)(7), it may grant relief under section 1507. Thus, section 1507 implies an even more expansive grant of power than already found in section 1521(a).

However, section 1507 does have limitations. First, it states that any assistance should be "[s]ubject to the specific limitations stated elsewhere in this chapter[.]"[93] Therefore, in determining whether relief may be granted as part of section 1507's "additional assistance," a court should look to the remainder of chapter 15 to guide its decision. Nevertheless, this instruction differs from section 1123(b)(6)'s instruction to look at subsections (1)–(5) to contextualize appropriate relief because chapter 15 covers a broader array of topics than section 1123(b)(1)–(5), which is limited to matters concerning and connected to the debtor. Section 1507's instruction also differs from section 1123(b)(6)'s other instruction that any other provisions not be inconsistent with applicable provisions of "this title" (as in, the Bankruptcy Code). Chapter 15 has a much different purpose and context—mainly to promote comity and international cooperation—thus entailing different limitations when compared to the Bankruptcy Code at large.[94] Accordingly, relief that is appropriate subject to limitations in chapter 15 must be different than relief that is not inconsistent with the applicable provisions of the Bankruptcy Code.

---

[93] 11 U.S.C. § 1507(a).

[94] See 11 U.S.C. § 1501 (establishing the scope and purpose of chapter 15).

Second, section 1507(b) establishes a list of considerations for courts when determining whether to provide such additional assistance. Those factors, like much of chapter 15, focus on whether relief would be "consistent with principles of comity[.]"[95] They direct a court to confirm that any additional assistance would reasonably assure just treatment of creditors, protection of U.S. claim holders against prejudice, prevention of preferential or fraudulent transfers, equitable distribution of assets in accordance with the Bankruptcy Code, and the provision of an opportunity for a fresh start for the debtor.[96]

By adding this list of considerations, Congress again established boundaries for courts in granting relief under chapter 15 and directed courts on how to determine if it is appropriate to grant relief. And again, these express prohibitions provide a more explicit and fuller picture of the broad relief a court may grant, as compared to that in section 1123(b)(6), and they direct a court to focus on principles of comity when considering granting the relief. Because comity is central to chapter 15, the relief granted in the foreign court does not have to be available in U.S. courts under chapter 11.[97] In other words, U.S. courts do not have to reject relief solely because it would be unavailable in the United States. However, there must be metrics to assess whether the proposed relief is appropriate. Section 1507(b) solves that problem by providing these considerations while prioritizing comity to foreign courts.

---

[95] 11 U.S.C. § 1507(b).
[96] Id.
[97] In re Metcalfe, 421 B.R. at 697.

As with section 1521, section 1507 thus differs from section 1123(b) because section 1123(b) does not expressly establish specific boundaries; instead, it directs courts to look to the rest of the Bankruptcy Code to determine whether a provision is appropriate. Because Congress expressed specific prohibitions, courts do not need to read further into its words like they do for section 1123(b).[98] The plain language of section 1507 (and section 1521) already enumerates the boundaries unambiguously.

Here, the Mexican Prepack Proceeding provided all the protections set out in section 1507(b).[99] Therefore, section 1507 allows this Court to enforce the relief entered in the Mexican Prepack Proceeding.

Accordingly, the plain language of both section 1521(a)(7) and section 1507(a) permit a U.S. court to enforce a foreign order for nonconsensual third-party releases. Nevertheless, even if the Chapter 15 Catchalls are ambiguous, the legislative history and canons of statutory construction confirm this interpretation and corresponding Congressional intent.[100]

---

[98] See Kaufman v. Allstate N.J. Ins., 561 F.3d 144, 155 (3d Cir. 2009) ("In interpreting a statute, the Court looks first to the statute's plain meaning and, if the statutory language is clear and unambiguous, the inquiry comes to an end." (citing Conn. Nat'l Bank v. Germain, 503 U.S. at 253–54)).

[99] For a fuller discussion of the fairness of the Mexican proceeding, see infra section B on section 1506's public policy considerations.

[100] Even where the plain language of a statute is ambiguous, courts will often examine the congressional intent to confirm their interpretation, especially for chapter 15 cases. See In re Elpida Memory, Inc., 2012 WL 6090194, at *5 ("[I]n interpreting Chapter 15, 'the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions.'" (quoting 11 U.S.C. § 1508)); In re Premier Int'l Holdings, Inc., 423 B.R. 58, 63–64 (Bankr. D. Del. 2010)

Congress enacted chapter 15 in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act to "provide effective mechanisms for dealing with cases of cross-border insolvency."[101] The legislative history of chapter 15 shows that a major purpose in its enactment was to promote comity for the orders of foreign courts. In fact, as discussed above, section 1501 explicitly establishes one of its purposes as promoting cooperation between U.S. courts and foreign courts.[102] Further, section 1508 directs courts "[i]n interpreting this chapter, [to] consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."[103] Thus, granting bankruptcy courts the authority to enforce nonconsensual third-party releases originating in foreign courts would promote chapter 15's goals of comity and providing assistance to foreign courts during foreign insolvency proceedings.[104]

Moreover, in examining multinational laws, as chapter 15 directs, nonconsensual third-party releases are widely accepted by foreign courts. Courts have previously looked to multinational laws in interpreting chapter 15 and determining whether certain relief would comport with international insolvency

---

("Moreover, regardless of whether the text is plain or ambiguous, it is appropriate to identify, if possible, a congressional purpose consistent with the Court's interpretation.").

[101] In re ABC Learning Ctrs. Ltd., 728 F.3d at 304.

[102] 11 U.S.C. § 1501.

[103] 11 U.S.C. § 1508.

[104] See In re ABC Learning Ctrs. Ltd., 728 F.3d at 306 (finding that chapter 15 directs courts to act in aid of main proceeding and to maximize assistance).

norms and the UNCITRAL Model Law on Cross-Border Insolvency, on which chapter 15 is based.[105] Other countries recognize nonconsensual third-party releases in insolvency proceedings.[106] Most relevant here, Mexican law provides for such releases.[107] That Mexican law provides for such releases further encourages the authority of this Court to enforce such releases in comity with the Mexican court.

Additionally, the DFC is correct that the sections should be read in their context pursuant to the canon of *ejusdem generis*. The Supreme Court has repeatedly stated that "a 'fundamental canon of statutory construction'[ is] that 'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"[108] However, the DFC neglects the major differences between the contexts of chapters 11 and 15. Namely, chapter 15 exists to provide assistance to foreign courts by granting comity to their orders.[109] Doing so promotes the purpose of an insolvency proceeding, which is to provide for equitable and

---

[105] See In re Servicos de Petroleo Constellation S.A., 600 B.R. 237, 273–74 (Bankr. S.D.N.Y. 2019) ("[I]t is therefore appropriate for U.S. bankruptcy courts to consider interpretations from other international jurisdictions that have adopted the Model Law." (citing In re Fairfield Sentry Ltd., 714 F.3d 127, 136 (2d Cir. 2013)).

[106] See In re Avanti Commc'ns Grp. PLC, 582 B.R. at 618 (finding such schemes common under United Kingdom law); In re Metcalfe, 421 B.R. at 699 (explaining that a Canadian court had the power to enter such relief).

[107] See supra note 35,  44–46 and accompanying text (explaining that the Mexican court here found the releases to be valid under Mexican law); Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de C.V.), 701 F.3d 1031, 1039–40 (5th Cir. 2017) (explaining that a Mexican court approved the releases at issue and that relief available in a foreign court need not be identical to or available under U.S. law).

[108] United States v. Miller, 604 U.S. _, slip op. at 13 (2025) (quoting Davis v. Mich. Dept. of Treasury, 489 U. S. 803, 809 (1989)).

[109] See In re ABC Learning Ctrs. Ltd., 728 F.3d at 306 (explaining courts should "maximize assistance").

orderly distribution of a debtor's assets in a manner that is enforceable across borders.[110]

Of course, a court's ability to enforce a foreign court's order has limitations, but Congress specified such limitations in the Bankruptcy Code. It specified relief that a court cannot grant under section 1521(a)(7).[111] It provided protections to consider before granting relief under section 1507.[112] It established that if such relief is manifestly contrary to public policy or violates a U.S. citizen's fundamental rights or procedural fairness, then it is not available.[113] All these limitations provide boundaries for relief under chapter 15 and ensure that it can have far-reaching consequences, so long as it is within these boundaries.[114] Accordingly, enforcing nonconsensual third-party releases granted in a foreign insolvency proceeding under that country's laws and in a fair proceeding is within this Court's authority under the Bankruptcy Code.

B. <u>The Third-Party Releases Are Not Manifestly Contrary to the Public Policy of the United States</u>

The DFC also contends that the Concurso Plan should not be enforced under the public policy exception of Bankruptcy Code section 1506. As explained above "[t]he public policy exception has been narrowly construed, because the 'word

---

[110] <u>See</u> <u>In re Energy Coal S.P.A.</u>, 582 B.R. at 627 (quoting <u>In re Atlas Shipping A/S</u>, 404 B.R. at 733) (explaining how comity to foreign court orders in the bankruptcy context is particularly important to promote the goals of bankruptcy).

[111] <u>See</u> 11 U.S.C. § 1521(a)(7) ("except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)").

[112] <u>See</u> 11 U.S.C. § 1507(b).

[113] <u>See</u> 11 U.S.C. § 1506.

[114] <u>See</u> <u>In re Atlas Shipping A/S</u>, 404 B.R. at 741 (acknowledging the boundaries for discretionary relief that Congress set in chapter 15).

'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States.'"[115] Therefore, courts should use this exception to deny enforcing foreign relief sparingly.[116]

"The public policy exception applies 'where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections' or where recognition 'would impinge severely a U.S. constitutional or statutory right.'"[117] The DFC did not object to the fairness of the proceedings, nor did it identify a constitutional or statutory right on which the Concurso Plan impinges. Nonetheless, the facts demonstrate that the Mexican proceeding comported with U.S. standards of procedural fairness, and the Concurso Plan does not violate any constitutional or statutory rights.

In the Mexican Prepack Proceeding, the DFC did not object to the Release and only raised the issue on appeal. There was an opportunity for objection, consistent with our own procedures, but the DFC did not avail itself of that opportunity. Article 164 of the Mexican Bankruptcy Law provides for an opportunity to object to a *concurso* plan, after which the Mexican court is to verify that the *concurso* plan complies with all the requirements for a valid plan and is not contrary to public policy; only then can a *concurso* plan be approved.[118] The DFC,

---

[115] In re ABC Learning Ctrs. Ltd., 728 F.3d at 308 (quoting H.R. Rep. No. 109–31(1), at 109 reprinted in 2005 U.S.C.C.A.N. 88, 172).

[116] In re ENNIA Caribe Holding N.N., 594 B.R. 631, 640 (S.D.N.Y. 2018) (citing In re Toft, 453 B.R. at 193).

[117] In re ABC Learning Ctrs. Ltd., 728 F.3d at 310 (quoting In re Qimonda AG Bankr. Litig., 433 B.R. 547, 570 (E.D. Va. 2010)).

[118] Estrada Supp. Dec. ¶ 25.

having failed to object in the Mexican Prepack Proceeding, cannot contend that there was a procedural unfairness, and in fact, does not contend that the Mexican's courts procedures were unfair.

Even though the DFC does not argue the Mexican proceedings were unfair or identify any facts that would support a finding of unfairness, this Court finds that the Mexican proceedings offered "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting."[119]

U.S. courts frequently have recognized Mexican *concurso* plans as being the product of a fair process.[120] In so holding, those courts have found that the contested Mexican *concurso* plans embodied arms'-length agreements and conformed to the general distribution priorities established in the Bankruptcy Code.[121] Mexican law

---

[119] Hilton v. Guyot, 159 U.S. at 202–03. Some courts have held that even where a claimant does not object to the fairness of the foreign proceeding, the bankruptcy court should nevertheless make a finding that the foreign proceeding was fair. See In re PT Bakrie Telecom Tbk, 628 B.R. at 884 (finding that, to enforce a foreign plan, a bankruptcy court must make a finding that the foreign proceeding abided by fundamental standards of procedural fairness).

[120] See, e.g., In re Cozumel Caribe, S.A. de C.V., 482 B.R. 96, 114–17 (Bankr. S.D.N.Y. 2012) (finding a Mexican insolvency proceeding fair); In re Metrofinanciera, S.A.P.I. de C.V., Sociedad Financiera de Objeto Multiple, E.N.R., No. 10-20666, 2010 WL 10075953, *3–4 (Bankr. S.D. Tex. Sept. 24, 2010) (same); JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005) (same).

[121] See, e.g., In re Metrofinanciera, 2010 WL 10075953, at *3.

also provides for due process to consider objections to a plan.[122] After creditors have been given the opportunity to object, Mexican law provides that the court may verify the plan if it complies with all the requirements for a valid plan and is not contrary to public policy.[123]

The present decision does not diverge from those prior decisions confirming the fairness of Mexican proceedings. The uncontroverted evidence before the Court is that the Concurso Plan's Release is customary and permitted under Mexican law; the Release is the product of arms'-length negotiations among the Chapter 15 Debtor, the Recognized Creditors, and the Shareholders; and the Concurso Plan was approved by a majority of the Recognized Creditors.[124]

It also is undisputed that the DFC played an active role in the Mexican Prepack Proceeding.[125] The DFC filed a proof of claim asserting that it was a privileged creditor.[126] The Mexican Court instead allowed the DFC's claim as an unsecured creditor and granted the DFC status as a Recognized Creditor.[127] The DFC has appealed that ruling, and the appeal remains pending.[128] The DFC did not

---

[122] See, e.g., id.

[123] Ley de Concursos Mercantiles [LCM] (Bankruptcy Law) art. 64, Diario Oficial de la Federación [DOF] 12-5-2000, últimas reformas DOF 14-1-2014 (Mex.); see also Estrada Supp. Dec. ¶ 25 (confirming the availability under Mexican law).

[124] Estrada Supp. Dec. ¶¶ 15–21.

[125] Id. ¶ 22.

[126] Id. ¶ 23.

[127] Id.

[128] Id. It bears noting that should the Mexican appellate court determine that the Release is impermissible, the Release would become ineffective here. This Court is not granting the Release. Instead, it is simply enforcing the Concurso Plan. If the Release provision of the Concurso Plan is later altered as a result of the DFC's

object to the Release but did object to the Concurso Plan on other grounds.[129] The

Mexican Court overruled the DFC's plan objection and entered the Concurso Order

approving the Concurso Plan. In so doing, the Mexican Court found that the

Concurso Plan complied with Mexican law and "neither the public interest nor the

individual interest of any specific creditor is violated, since the terms agreed to will

apply to all creditors equally . . . ."[130] The extent of the DFC's participation and the

Mexican court's finding that the Concurso Plan would not violate the public interest

or the interests of any creditors both emphasize the DFC's opportunity (of which it

did not avail itself) to object to the Release before the approval of the Concurso

Plan. The Mexican court provided the DFC with a full and fair opportunity to be

heard, which is a central tenet of U.S. procedural fairness.[131]

Therefore, in consideration of the fairness of this proceeding, the procedural

safeguards typical under Mexican law, and the fact that the DFC has not identified

an example of lack of fairness, this Court finds that the Mexican proceeding was

procedurally fair.

Likewise, the DFC has identified no constitutional or statutory right upon

which the Concurso Plan impinges. Its only argument is that nonconsensual third-

party releases are manifestly contrary to U.S. public policy because the Purdue

---

appeal, the Release would only be enforceable in the United States—if at all—to the
extent provided by the Concurso Plan.

[129] Id. ¶ 24.

[130] Concurso Order at 60.

[131] Cf. Vertiv, Inc., 92 F.4th at 181 ("[A] United States court is well within its
discretion to deny the extension of comity to foreign proceedings that deny 'notice
and opportunity to be heard' to a party opposing comity.").

decision prohibits them in most chapter 11 plans.[132] However, far from being

"manifestly contrary to the public policy of the United States," nonconsensual third-

party releases are expressly permitted under Bankruptcy Code section 524(g) in the

context of asbestos cases. Furthermore, in Purdue, the Supreme Court noted that

while it held that nonconsensual third-party releases are not permitted under

chapter 11 (except in the asbestos context under Bankruptcy Code section 524(g)),

Congress could have authorized them.[133] Indeed, the Supreme Court framed this

issue in terms of the policy choices that Congress is authorized to make. To be

manifestly contrary to U.S. public policy, the contested relief must impinge on some

constitutional or statutory right; if a nonconsensual third-party release impinged on

some constitutional right, the Supreme Court would not have said that Congress

could provide for it. Accordingly, Congress has authorized nonconsensual third-

party releases before, and the Supreme Court has explicitly said that it could do so

again in the context of chapter 11 if it so desired. Lack of specific availability in U.S.

courts does not equate to manifest contrariness to U.S. public policy, especially

where, as here, the contested relief is available in other contexts and could be made

available more broadly by a simple act of Congress.[134]

---

[132] But see In re Metcalf, 421 B.R. at 697 (explaining that even if relief in a foreign order is not typically available in a U.S. proceeding, it may be available in a chapter 15 proceeding pursuant to principles of comity).

[133] See Purdue, 603 B.R. at 222 (noting that "the [Bankruptcy Code] *does* authorize courts to enjoin claims against third parties without their consent, but does so in only *one* context" (emphasis in original)).

[134] See In re Metcalf, 421 B.R. at 697 (so holding); In re Rede Energia S.A., 515 B.R. at 91 (holding the same and emphasizing that the "public policy exception is clearly drafted in narrow terms and the few reported cases that have analyzed section

The <u>In re Vitro S.A.B. de C.V.</u> court makes a similar point. While the Fifth Circuit denied enforcement of a Mexican plan's third-party release provisions, it noted that "although our court has firmly pronounced its opposition to [nonconsensual third-party] releases, relief is not thereby precluded under § 1507, which was intended to provide relief not otherwise available under the Bankruptcy Code or United States law."[135] Thus, it found that it could not deny the relief simply on the basis that third-party releases were not available in its jurisdiction.[136] Instead, the <u>In re Vitro</u> court only declined to enforce the plan in that case because of the role in the approval process of the votes of insiders holding intercompany claims.[137]

Simply put, if permitting third-party releases is a policy decision that Congress can and has made, it cannot also be true that enforcing such releases where principles of cooperation and comity so require in chapter 15 would be "manifestly contrary to the public policy of the United States." The simple fact that a U.S. court could not grant such releases in a typical chapter 11 plan does not

---

1506 at length recognize that it is to be applied sparingly" (internal quotations and alterations omitted)); <u>In re ABC Learning Ctrs.</u>, 728 F.3d at 311 (finding that although Australian insolvency law used a different prioritization scheme from U.S. bankruptcy law, recognizing and enforcing the Australian proceeding would not be manifestly contrary to U.S. public policy, and in fact, refusing to recognize and enforce it would allow claimants to circumvent the Australian courts and undermine U.S. public policies of ordered proceedings and equal treatment).

[135] <u>In re Vitro</u>, 701 F.3d at 1062.

[136] <u>Id.</u>

[137] <u>Id.</u> at 1067. Because the court decided that case on other grounds, it did not rule on whether third-party releases would be manifestly contrary to public policy under section 1506. <u>Id.</u> at 1069–70

make them manifestly contrary to U.S. public policy so as to require this Court to prohibit enforcement of the Release in this chapter 15 case. The DFC's public policy exception argument fails.

## CONCLUSION

Accordingly, chapter 15 authorizes this Court to enforce nonconsensual third-party releases ordered by foreign courts. The plain language of Bankruptcy Code sections 1521(a) and 1507 give this Court a broad grant of discretion to aid foreign courts in accordance with principles of comity. Nothing in the plain language of these statutes or the legislative history or canons of construction indicates that Congress intended to diverge from this policy of comity to prohibit enforcing releases entered by foreign courts. The Mexican Prepack Proceeding was fair, and the Concurso Plan and the Concurso Order are not manifestly contrary to U.S. public policy. Therefore, this Court enforces the Concurso Plan and the Concurso Order in their entirety.

Dated: April 1, 2025
Wilmington, Delaware

_____
Thomas M. Horan
United States Bankruptcy Judge